IN THE SUPREME COURT OF NORTH CAROLINA

No. 93A15-2

Filed 21 December 2016

TOWN OF BOONE,
    Plaintiff

   v.

STATE OF NORTH CAROLINA,
    Defendant,

COUNTY OF WATAUGA,
    Intervenor-Defendant


Appeal pursuant to N.C.G.S. § 7A-27(a1) from an order entered on 29 July 2015

by a three-judge panel of the Superior Court, Wake County, appointed by the Chief

Justice under N.C.G.S. § 1-267.1.  Heard in the Supreme Court on 22 March 2016.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Daniel F.E. Smith, Jim W. Phillips, Jr., and Julia C. Ambrose, for plaintiff-appellee.*

*Roy Cooper, Attorney General, by Lauren M. Clemmons, Special Deputy Attorney General, for defendant-appellant.*

*Eggers, Eggers, Eggers & Eggers, by Stacy C. Eggers, IV, for intervenor-defendant-appellant.*

NEWBY, Justice.


In this case we consider whether the General Assembly may withdraw the

previous extension of a town's jurisdiction beyond its corporate limits and return

governance to the county.  The first clause of Article VII, Section 1 of our state

constitution recognizes the historic plenary authority of the General Assembly to

provide for the "organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions." This language acknowledges the legislative power to organize local government and fix the jurisdictional boundaries. Extraterritorial jurisdiction affects the organization of local governmental subdivisions by extending a town's jurisdiction into the county, thus shifting the political authority over certain subjects from one local government to another. Here, by withdrawing the Town of Boone's extraterritorial jurisdiction, the legislature restored the local jurisdictional boundaries as originally fixed, returning the governance of territory located outside of the Town limits to Watauga County. The limitations imposed by Article II, Section 24 do not apply to an action by the General Assembly establishing or modifying the jurisdictional boundaries of local governmental units. Because the legislative act withdrawing the Town's extraterritorial jurisdiction falls squarely within this plenary power, we hold that the act is constitutional, and we reverse the decision of the trial court.

Historically, the General Assembly established the governmental jurisdiction of a municipality by fixing the municipality's corporate limits. *See State v. Eason*, 114 N.C. 787, 795, 19 S.E. 88, 90 (1894) ("[T]he jurisdiction of a municipality does not extend beyond [its boundary], in the absence of some other language in the charter . . . ."). Beginning in the late 1800s, the General Assembly began to extend the jurisdiction of select municipalities beyond their corporate limits with regard to designated governmental functions. *See id.* at 792, 19 S.E. at 89 ("[T]he legislature unquestionably ha[s] the power to extend the jurisdiction of the town, for police

purposes . . . ."); *see also, e.g.*, Act of Jan. 17, 1911, ch. 2, sec. 27, 1911 N.C. Priv. [Sess.] Laws 3, 17 (extending the City of Greensboro's jurisdiction for sanitation and the protection of city property for one mile "outside of said city limits"). Each grant of extraterritorial authority was by local act on a city-by-city basis. Despite the growing usage of extraterritorial jurisdiction, the General Assembly precluded municipalities in Watauga County from governing extraterritorially. *E.g.*, Act of May 26, 1955, ch. 1334, 1955 N.C. Sess. Laws 1387 (authorizing municipalities to regulate the subdivision of land within one mile of the corporate limits but excluding Watauga County and fifty-two other counties); *see also* Act of June 19, 1959, ch. 1204, sec. 1, 1959 N.C. Sess. Laws 1354, 1354 (expressly precluding towns located within Watauga County from governing extraterritorially). In 1961 the General Assembly granted extraterritorial jurisdictional authority to certain municipalities located within Watauga County, including the Town of Boone, over territory not more than one mile beyond their corporate limits. Act of May 30, 1961, ch. 548, sec. 1¾, 1961 N.C. Sess. Laws 748, 748. Article 19 of Chapter 160A of the General Statutes includes the current codification of extraterritorial jurisdiction.

For twenty years, the Town did not attempt to govern within the extraterritorial area. In 1981 the Town "initiate[d] the steps necessary to extend extraterritorial [jurisdiction] to [the] one mile perimeter" surrounding the Town and also sought "permission from the Watauga County Board of Commissioners to extend this radius to two miles." *See* N.C.G.S. § 160A-360(a) (2015) (requiring approval from

the county to extend jurisdiction beyond the one-mile perimeter).[1]  When the County

denied the Town's request to exercise jurisdiction beyond the one-mile extraterritorial

area, the Town adopted Ordinance 82-11 to exercise "[e]xtraterritorial zoning

jurisdiction pursuant to [N.C.G.S. §] 160A-360" for five specified areas located within

the permitted one-mile perimeter outside the Town limits.  Boone, N.C., Ordinance

82-11 (Aug. 26, 1982).[2]

In 2014 the General Assembly withdrew extraterritorial jurisdiction from the

Town and returned governance of the areas to the County.  Act of June 26, 2014, ch.

33, sec. 1, 2013 N.C. Sess. Laws (Reg. Sess. 2014) 139, 140 (the Boone Act)

("Notwithstanding any other provision of law, the Town of Boone shall not exercise

---

[1] Even when a municipality wishes to exercise extraterritorial jurisdiction in an area within one mile of its corporate limits, county approval is required if the county is already enforcing zoning ordinances, subdivision regulations, and the State Building Code in that area.  N.C.G.S. § 160A-360(e) (2015).

[2] A municipality that wishes to exercise extraterritorial jurisdiction must specify by ordinance the areas to be included, defining the boundaries "to the extent feasible, in terms of geographical features identifiable on the ground."  N.C.G.S. § 160A-360(b) (2015).  These boundaries must "at all times be drawn on a map, set forth in a written description, or shown by a combination of these techniques."  *Id.*  A copy of this delineation must be filed with the Register of Deeds and, as is true of the delineation of the municipality's corporate boundaries, maintained in the office of the municipality's clerk.  *Id.* §§ 160A-22 (2015), -360(b).

To establish its extraterritorial boundary, the Town adopted Ordinance 83-2, describing the extraterritorial area by metes and bounds and topographical features, Boone, N.C. Ordinance 83-2, § 1 (Mar. 31, 1983), and amended the zoning map to include the extraterritorial area, *id.* § 4.  The Town later expanded its reach of extraterritorial jurisdiction into other specified areas located within the one-mile perimeter.  *E.g., id.* 83-5 (Apr. 7, 1983); *id.* 87-12 (Dec. 22, 1987); *id.* 92-03 (Sept. 3, 1992); *id.* 98-04 (Nov. 19, 1998); *id.* 99-02 (May 27, 1999).  With each additional area, the Town amended its zoning map to reflect and describe the new boundaries.  *E.g., id.* 83-2, § 4; *id.* 83-5; *id.* 87-12, § 4; *id.* 92-03, § 4; *id.* 98-04, § 4; *id.* 99-02, § 4.  County residents living within the added territory were then notified that the political body governing zoning and development had changed.  *See* N.C.G.S. § 160A-360(a1) (2015).

any powers of extraterritorial jurisdiction as provided in Article 19 of Chapter 160A of the General Statutes."). The Boone Act effectively reorganized the specified local governmental jurisdictions within Watauga County by confining the Town's jurisdictional reach to its corporate limits and restoring governance of the extraterritorial area to the County. *See* N.C.G.S. §§ 160A-360(a)-(b) (2015).

The Town filed its complaint, challenging the Boone Act as a facially unconstitutional local act prohibited by Article II, Section 24 of the North Carolina Constitution. The State unsuccessfully moved to dismiss the complaint and, in its answer, denied the Town's allegations regarding the applicability of Article II, Section 24.[3] The County intervened, asserting its "special interest" in the action as a "property owner" and "the duly elected governing body for the citizens and residents residing within the former extraterritorial jurisdiction."[4]

A three-judge panel heard oral arguments and granted summary judgment in favor of the Town, concluding "that the revocation of the Town of Boone's power of

---

[3] The State contends that plaintiff's claims are barred by the doctrine of sovereign immunity, that "[p]laintiff lacks standing, as well as the capacity to sue, for the withdrawal of its extraterritorial jurisdictional powers," that reallocation of authority over planning and development within the extraterritorial jurisdiction "constitutes a legitimate exercise of legislative authority over [the legislature's] political subdivisions" and a non-justiciable . . . political question[ ] within the purview of the legislative branch of government," and that plaintiff fails to state a claim for relief under the state constitution. Because we resolve this case based on the General Assembly's plenary power acknowledged in the first clause of Article VII, Section 1, we do not address the other arguments.

[4] Residents of extraterritorial jurisdiction areas are not allowed to vote in local government municipal elections; they remain county residents for voting purposes. *See* Ordinance 82-11; N.C.G.S. §§ 160A-360(a1), -362 (2015).

extraterritorial jurisdiction by [the Boone Act] is unconstitutional pursuant to the prohibition on local acts contained in Article II, Section 24" and enjoining its implementation. The State and the County appealed that decision under N.C.G.S. § 7A-27(a1).

The State and the County argue that, under Article VII, Section 1 of the constitution, the legislature delegates to municipalities the authority to govern a particular territory and retains plenary power to modify the governance of that geographic territory. To hold otherwise would allow Article II, Section 24 to impermissibly restrict the General Assembly's broad authority over municipalities as acknowledged by Article VII, Section 1. The Town responds that the Boone Act is a prohibited local act because it removes the authority of the Town to enforce its ordinances, some of which may "[r]elat[e] to health, sanitation, and the abatement of nuisances," N.C. Const. art. II, § 24(1)(a), or "[r]egulat[e] labor, trade, mining, or manufacturing," *id.* art. II, § 24(1)(j), and that the Act otherwise partially repeals N.C.G.S. § 160A-360, a general law, *see id.* art II, § 24(2).

The analytical framework for reviewing a facial constitutional challenge is well-established. Our "State Constitution is in no matter a grant of power," *Lassiter v. Northampton Cty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd*, 360 U.S. 45, 79 S. Ct. 985, 3 L. Ed. 2d 1072 (1959), and as such, "[a]ll power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it," *id.* at

112, 102 S.E.2d at 861 (citation omitted). *See also State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895) ("[P]ower resides with the people and is exercised by their representatives in the General Assembly."). "We seldom uphold facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009) (citation omitted). An act of the General Assembly will be declared unconstitutional only when "it [is] plainly and clearly the case," *State ex rel. Martin v. Preston,* 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989) (quoting *Glenn v. Bd. of Educ.,* 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936)), and its unconstitutionality must be demonstrated beyond reasonable doubt, *Baker v. Martin,* 330 N.C. 331, 334-35, 410 S.E.2d 887, 889 (1991) (citations omitted).

Though not expressly stated in our first constitution, the General Assembly has long enjoyed plenary power to create political subdivisions of local government, establish their jurisdictional boundaries, and invest them with certain powers, *see Quality Built Homes Inc. v. Town of Carthage*, ___ N.C. ___, ___, 789 S.E.2d 454, 457 (2016), which "may be enlarged, abridged or modified at the will of the legislature," *id.* at ___, 789 S.E.2d at 457 (quoting *White v. Comm'rs of Chowan Cty.*, 90 N.C. 437, 438 (1884)). Our Constitution of 1868 affirmed "the duty of the Legislature to provide for the organization of cities, towns, and incorporated villages." N.C. Const. of 1868, art. VIII, § 4. By 1876, following a brief suspension of "provisions relating to municipal[ities]" during Reconstruction, *see id.*, art. VII, § 12, the constitution

reaffirmed that "[t]he General Assembly shall have full power by statute to modify, change, or abrogate any and all of the provisions" pertaining to municipalities, *id.*, Amends. of 1875, art. VII, § 14. *See Journal of the Constitutional Convention of the State of North Carolina* 162-63 (Raleigh, Josiah Turner 1875) (dismissing concerns that the 1875 amendment to Article VII would provide "unlimited control of the Legislature" over "the municipal government of cities, towns, &c.").

Local political subdivisions are "mere instrumentalities of the State for the more convenient administration of local government," *Holmes v. City of Fayetteville*, 197 N.C. 740, 746, 150 S.E. 624, 627 (1929), *appeal dismissed per curiam*, 281 U.S. 700, 50 S. Ct. 353, 74 L. Ed. 1126 (1930), whose territory and functions rest "in the absolute discretion of the state," *State ex rel. Dyer v. City of Leaksville*, 275 N.C. 41, 50, 165 S.E.2d 201, 207 (1969) (quoting *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178, 28 S. Ct. 40, 46, 52 L. Ed. 151, 159 (1907)); *accord Greensboro-High Point Airport Auth. v. Johnson*, 226 N.C. 1, 9-10, 36 S.E.2d 803, 809 (1946). Under its plenary power, the General Assembly may create, organize, and abolish these local governmental units, arranging and rearranging local government to best meet the specific local needs of the people. *See People ex rel. Van Bokkelen v. Canaday*, 73 N.C. 198, 222 (1875) (Political subdivisions "are parts and parcels of the State, organized for the convenience of local self-government."); *accord White*, 90 N.C. at 438. Each locality presents different challenges and needs for the arrangement of local governmental units. The General Assembly is the only branch of government

equipped to organize local government and, through oversight, craft responses to the changing needs of local communities.

As acknowledged by the case law, this broad power of the General Assembly has remained unchanged throughout our history and is recognized in Article VII, Section 1 of our current constitution, adopted in 1971:

> The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.

N.C. Const. art. VII, § 1. As such, Article VII, Section 1 "is not a delegation of power to the General Assembly" but "a general description" and "merely a recognition" of "the General Assembly's power to provide for the organization and powers of local government," *Report of the North Carolina State Constitution Study Commission* 85 (1968) [hereinafter *1968 Constitution Commission Report*], as affirmed in the 1875 amendment, which "gave the General Assembly full power to revise or abolish the form and powers of county and township governments," *id.* at 143.[5]

---

[5] Significantly, the text of Article VII, Section 1, recognizing the General Assembly's historic duty to provide for local government, was adopted against the backdrop of Article II, Section 24 and the various court decisions describing its application. *See 1968 Constitution Commission Report* 85; *see also N.C. State Bar v. DuMont*, 304 N.C. 627, 635, 286 S.E.2d 89, 94 (1982) (relying on the *1968 Constitution Commission Report* to "ascertain[ ] the intent of the framers and adopters, [and] the object and purpose of the revision"). Following well-established principles of construction, one amendment cannot be read to eliminate the other, and the one more recent in time is given its full application. *In re Peoples*, 296 N.C. 109, 159, 250 S.E.2d 890, 919 (1978) (considering constitutional amendments "*in pari materia* with the other sections of our Constitution which it was intended to supplement" (citations omitted)),

The text of the first clause of Article VII, Section 1, "[t]he General Assembly shall provide for the organization and government and the fixing of boundaries" of local governmental entities, mandates the statutory creation, structuring, restructuring, and defining of local governmental subdivisions and their jurisdictional boundaries. We look to the plain meaning of the phrase to ascertain its intent. *State v. Webb*, 358 N.C. 92, 97, 591 S.E.2d 505, 510-11 (2004) (The constitution is construed for its plain meaning.); *see also Dunn v. Pac. Emp'rs Ins. Co.*, 332 N.C. 129, 134, 418 S.E.2d 645, 648 (1992) (Ordinary rules of grammar apply.). Each word informs a proper understanding of the whole. "Organization" means something "put together into an orderly, functional, [and] structured whole." *Organize*, *The American Heritage Dictionary* 926 (new coll. ed. 1979). "Government" is defined as "[t]he act or process of governing; especially, the administration of public policy in a political unit; political jurisdiction." *Government, id.* at 570. The "fixing of boundaries" means establishing borders or limits. *See Fix* and *Boundary*, *id.* at 497, 156. Thus, the plain meaning of the phrase "organization and government and fixing of boundaries" includes the designation and realignment of the political jurisdictions of local governmental units.

The General Assembly alone has the oversight responsibility and authority to define, limit, and expand the otherwise competing jurisdictions of local political

---

*cert. denied*, 442 U.S. 929, 99 S. Ct. 2859, 61 L. Ed. 2d 297 (1979); *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953) ("Constitutional provisions should be construed in consonance with the objects and purposes in contemplation *at the time of their adoption*." (emphasis added)).

subdivisions. *See Hailey v. City of Winston-Salem*, 196 N.C. 17, 22-23, 144 S.E. 377, 380 (1928) ("When a new governmental agency is established by the Legislature, such as a municipal corporation, it takes control of all the affairs over which it is given authority, to the exclusion of other governmental agencies.").[6] Setting the jurisdictional boundaries of political subdivisions is left to legislative discretion.[7] Since the needs of each community differ, this Court has repeatedly acknowledged the practical reality that the General Assembly may exercise that discretion by local act.[8]

---

[6] Instances of creating, organizing, and reorganizing political subdivisions have met this Court's approval, both before and after the 1917 amendments that created the predecessor to Article II, Section 24. *See, e.g., Bethania Town Lot Comm. v. City of Winston-Salem*, 348 N.C. 664, 668, 502 S.E.2d 360, 362 (1998) ("The General Assembly may, by special or local act, create municipalities and change the boundaries of municipalities." (citations omitted)); *Lilly v. Taylor*, 88 N.C. 489, 490-91, 494-95 (1883) (affirming the legislature's creation and subsequent repeal of the charter of the Town of Fayetteville); *Mills v. Williams*, 33 N.C. (11 Ired.) 558, 560, 563-64 (1850) (upholding the legislature's "power to create and abolish" Polk County); *see also In re Ordinance of Annexation No. 1977-4*, 296 N.C. 1, 16-17, 249 S.E.2d 698, 707 (1978) (Municipalities have no inherent constitutional right to their boundaries and derive authority only from the powers delegated by the legislature. (citations omitted)).

[7] *See Piedmont Ford Truck Sale, Inc. v. City of Greensboro*, 324 N.C. 499, 502, 380 S.E.2d 107, 109 (1989) ("The extension of boundaries of cities has been held to be a political decision . . . ." (citations omitted)); *see also Texfi Indus., Inc. v. City of Fayetteville*, 44 N.C. App. 268, 273, 261 S.E.2d 21, 25 (1979) (recognizing the General Assembly's authority to create, destroy, or change the boundaries of any political subdivision), *aff'd*, 301 N.C. 1, 269 S.E.2d 142 (1980); *Jones v. Jeanette*, 34 N.C. App. 526, 532, 239 S.E.2d 293, 296 (1977) (stating that setting boundaries under Article VII, Section 1 is a "permissible legislative function" "left to legislative discretion" (citing, *inter alia, Hunter*, 207 U.S. at 178-79, 28 S. Ct. at 46, 52 L. Ed. at 159)).

[8] *See Bethania Town Lot Comm.*, 348 N.C. at 668, 502 S.E.2d at 362; *Plemmer v. Matthewson*, 281 N.C. 722, 725, 190 S.E.2d 204, 206-07 (1972) (The legislature may create a municipality by special act and may provide procedures for annexation by special act.); *Town of Highlands v. City of Hickory*, 202 N.C. 167, 168, 162 S.E. 471, 471 (1932) (upholding a local act that extended the municipal limits of one town and repealed statutes under which adjacent towns were organized); *Holmes*, 197 N.C. at 748, 150 S.E. at 628 (The legislature

The second clause of Article VII, Section 1 concerns the authority of the General Assembly to confer specific "powers and duties" on local governmental units. Unlike the first clause in Article VII, Section 1, the second clause includes an express limitation; namely, it prohibits any legislative delegation of "powers and duties" to local governmental units that is "otherwise prohibited by this Constitution." Only under the second clause, then, is the General Assembly's authority over local governments expressly subject to limitations imposed by other constitutional provisions, including the constraints on local acts in Article II, Section 24 first adopted in 1917. For example, under the Article II, Section 24 prohibition on certain local acts, the General Assembly cannot grant to one county the power to enact local employment legislation, *see Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 191, 581 S.E.2d 415, 430 (2003), or remove a city's power to enforce certain ordinances regarding specific properties within its municipal limits, *see City of New Bern v. New Bern–Craven Cty. Bd. of Educ.*, 338 N.C. 430, 442, 450 S.E.2d 735, 742 (1994).[9]

---

may extend by special act extraterritorial jurisdiction and the authority of a municipality to provide services outside its corporate limits.); *State v. Rice*, 158 N.C. 635, 636, 74 S.E. 582, 582 (1912) (recognizing the legislature's authority to allow the exercise of extraterritorial jurisdiction outside municipal limits by local act); *Lutterloh v. City of Fayetteville*, 149 N.C. 65, 69, 62 S.E. 758, 760 (1908) (recognizing validity of extension of corporate boundaries through annexation by local act); *see also In re City of Durham Annexation Ordinance*, 69 N.C. App. 77, 84, 316 S.E.2d 649, 654 ("Article VII, Section 1 is not a power of the General Assembly which must be carried out or enacted by general laws as defined in Article XIV, Section 3."), *appeal dismissed and disc. rev. denied*, 312 N.C. 493, 322 S.E.2d 553 (1984).

[9] This approach of conducting an Article II, Section 24 analysis only when the challenged statute specifies a specific "power" or "duty" is consistent with our prior decisions. In *Piedmont Ford Truck Sale, Inc. v. City of Greensboro*, the plaintiffs challenged a local act annexing certain land to the City of Greensboro. 324 N.C. 499, 501, 380 S.E.2d 107, 108 (1989). While the annexation clearly arose under the authority to "fix the boundaries of

Acting under its plenary authority, the General Assembly creates municipalities. Historically, the municipality's governmental authority ended at its corporate limits. The General Assembly first granted municipalities the authority to govern extraterritorially by amending municipal charters.[10] Even after the adoption of the restrictions on local acts, the legislature continued to delegate to select cities on an individual basis the authority to enforce more comprehensive zoning

cities" acknowledged in Article VII, Section 1, *id.* at 503, 380 S.E.2d at 110, because the act also contained a specific "provision regarding solid waste collection," the plaintiffs argued the statute violated Article II, Section 24, *id.* at 504, 380 S.E.2d at 110. Because the statute specified a particular "power," this Court conducted an analysis under Article II. *Id.* at 504-06, 380 S.E.2d at 110-11. When viewed as a whole, the explicit grant of power was a "small part" of the legislation, *id.* at 506, 380 S.E.2d at 111, and this Court concluded that "[t]he provision . . . regarding solid waste collection" did not violate Article II, Section 24, *id.* at 506, 380 S.E.2d at 111. *See also, e.g.*, *Lamb v. Bd. of Educ.*, 235 N.C. 377, 379-80, 70 S.E.2d 201, 203 (1952) (concluding that an act expressly restricting certain express powers of the Randolph County Board of Education violated the Article II limitations on local acts); *Idol v. Street*, 233 N.C. 730, 733, 65 S.E.2d 313, 315 (1951) (concluding that an act that "confer[red] power upon the Board of Aldermen of the City of Winston-Salem and the Board of Commissioners of Forsyth County" to, *inter alia*, "name a joint city-county board of health," which varied from general law, "[wa]s a local act relating to health" in violation of the Article II limitations on local acts); *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. 140, 143-44, 16 S.E.2d 677, 678-79 (1941) (concluding that an act removing from the Nash County Board of Health the power to appoint a county health officer was a local act relating to health in violation of the Article II limitations on local acts).

[10] *See Rice*, 158 N.C. at 636, 640, 74 S.E. at 582, 584 (upholding a City of Greensboro ordinance regulating hog farming within one-fourth mile of the corporate limits, adopted pursuant to the 1911 statutory delegation of authority by charter amendment).

regulations within their one-mile perimeters.[11]    Over time extraterritorial

jurisdiction has become more common and the governmental authority expanded.[12]

At its essence, jurisdiction is "[a] government's general power to exercise

authority over all persons and things within its territory" or the "geographic area

within which political . . . authority may be exercised."  *Jurisdiction, Black's Law

Dictionary* (10th ed. 2014).    Extraterritorial jurisdiction extends the Town's

jurisdictional boundary, allowing the Town to impose certain ordinances—already

applicable within its corporate limits—one mile into County territory without the

County's approval, thus superseding any County regulations on those same subjects.

*See* N.C.G.S. § 160A-360 (2015); *see also* Trey Allen, Univ. of N.C. Sch. of Gov't,

*General Ordinance Authority, in County and Municipal Government in North

Carolina* 77, 84 (Frayda S. Bluestein ed., 2d ed. 2014) ("A city may enforce zoning and

other development ordinances inside its corporate limits and within its

extraterritorial jurisdiction (ETJ). . . . When a city chooses to enforce development

---

[11] *E.g.*, Act of Apr. 23, 1949, ch. 1192, sec. 1, 1949 N.C. Sess. Laws 1521, 1521 (authorizing Town of Tarboro to exercise zoning powers within one mile beyond the Town's corporate limits); Act of Mar. 31, 1949, ch. 700, sec. 3, 1949 N.C. Sess. Laws 732, 733 (same for City of Gastonia); Act of Mar. 28, 1949, ch. 629, secs. 1, 2, 1949 N.C. Sess. Laws 640, 640-41 (same for Town of Chapel Hill); Act of Mar. 25, 1949, ch. 540, secs. 1, 4, 1949 N.C. Sess. Laws 541, 541-42, 543 (same for City of Raleigh); *see also Report of the Municipal Government Study Commission* 18 (1958) [hereinafter *Municipal Report*] ("A total of 19 cities have, by special act, been given authority to zone for one mile or more beyond their limits.").

[12] Whether enforcing its ordinances inside its municipal limits or extraterritorially, a town receives the authority to govern territory from the legislature.  *See Holmes*, 197 N.C. at 744, 150 S.E. at 626 ("The general rule is that a municipal corporation has no extra-territorial powers . . . ."); *Town of Lake Waccamaw v. Savage*, 86 N.C. App. 211, 213, 356 S.E.2d 810, 811 (recognizing that the General Assembly may by local act permit a town to exercise extraterritorial jurisdiction), *disc. rev. denied,* 320 N.C. 797, 361 S.E.2d 89 (1987).

ordinances in its ETJ, the county's development ordinances no longer apply there . . . ."). Extraterritorial jurisdiction remains extraordinary because it broadens a municipality's jurisdictional reach beyond its corporate limits. This extension of extraterritorial jurisdictional authority deprives the residents of the extraterritorial area of meaningful representation and the right to vote for local government representatives who shape policies affecting their property interests.[13] *See Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535, 11 L. Ed. 2d 481, 492 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.").

The pivotal question before this Court is whether the Boone Act, which withdraws the Town's extraterritorial jurisdiction, is an exercise of the General Assembly's plenary authority to "provide for the organization and government and fixing of boundaries" of local government under the first clause of Article VII, Section 1. If so, our analysis ends, and there is no need to address the application of the

---

[13] County citizens residing within the affected territory cannot vote for Town officials. Ordinance 82-11; *see* N.C.G.S. §§ 160A-360(a1), -362. While County residents subject to the Town's extraterritorial jurisdiction are represented on the Town's planning board and board of adjustment, Ordinance 82-11, these extraterritorial-jurisdiction appointees may only vote on matters involving the extraterritorial area, *see* N.C.G.S. §§ 160A-360(a1), -362; *see also Municipal Report* 18 ("[G]overnmental action affecting the use of property should originate in a governing board elected by persons subject to such action . . . [and] residents of the area affected should be given a voice . . . through the naming of outside residents to local planning boards and boards of adjustment.").

second clause of Article VII, Section 1 and any restrictions imposed by Article II, Section 24.

Extraterritorial jurisdiction is inextricably tied to a municipality's authority to enforce its zoning and development ordinances within certain geographic boundaries. By retracting the Town's jurisdictional reach to its corporate limits, the Boone Act restores the local government boundaries within Watauga County as originally fixed. This local jurisdictional reorganization is precisely the type of "organization and government and fixing of boundaries" contemplated by the first clause of Article VII, Section 1 and historically approved by this Court. The Boone Act withdraws from the Town its extraterritorial jurisdiction and its governing authority to enforce certain ordinances within the one-mile perimeter and returns governance of that territory to the County and its residents. The General Assembly is the only body politic uniquely qualified to oversee local government and set the jurisdictional lines that divide the Town and the County.

Because the state constitution authorizes the General Assembly to reduce the Town's jurisdictional reach, the removal of extraterritorial jurisdiction falls squarely within the legislature's general power as described in the first clause of Article VII, Section 1. For the reasons stated above, the decision of the three-judge panel finding the Act unconstitutional is reversed.

REVERSED.

Justice ERVIN concurring in the result.

Although I concur in the Court's determination that the Boone Act is not facially unconstitutional, I am unable to agree with the Court's determination to uphold the Boone Act pursuant to the first portion of the first paragraph of Article VII, Section 1 of the North Carolina Constitution, which recognizes the General Assembly's authority to provide for the "organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions" on the theory that the Boone Act effectuates a "reorganization" of the authority granted to Boone and Watauga County. N.C. Const. art. VII, § 1. Instead, I believe that a determination of the constitutionality of the Boone Act hinges upon the second part of the first paragraph of Article VII, Section 1, which recognizes the General Assembly's authority to "give such powers and duties to counties, cities and towns, and other governmental subdivisions as [the General Assembly] may deem advisable" so long as any legislation that is enacted pursuant to this provision is not "otherwise prohibited by [the North Carolina] Constitution." *Id.* For the reasons set forth below, while I believe that the General Assembly's decision to alter the Town's regulatory authority is subject to constitutional limitations, such as those contained in Article II, Section 24, I also believe that the Boone Act is not impermissibly connected to the subjects about which the General Assembly lacks the authority to enact local legislation. Moreover, even if the Boone Act does implicate "the organization and government and the fixing of boundaries" provision, that determination does not

obviate the necessity for the Court to consider "any restrictions imposed by Article II, Section 24" given our decision in *Piedmont Ford Truck Sale, Inc. v. City of Greensboro*, 324 N.C. 499, 380 S.E.2d 111 (1989). As a result, while I concur in the result reached by the Court, I am unable to join its decision.

Although the Court believes that its decision to uphold the constitutionality of the Boone Act obviates the need to address the State's sovereign immunity and standing arguments, I do not find that assertion convincing. Since both sovereign immunity and standing are threshold issues, they must be addressed in order for the Court to reach the merits of the constitutional claims that have been advanced for our consideration. For that reason, I will begin by addressing the sovereign immunity and standing arguments that the State has advanced in opposition to the Town's claims.

In seeking relief from the order of the three-judge panel of the Superior Court, Wake County, before this Court, the State argues that the panel erred by granting summary judgment in the Town's favor because (1) the Town's challenge to the Boone Act is barred by the doctrine of sovereign immunity; (2) the Town lacks standing to challenge the constitutionality of the Boone Act; and (3) the Town's challenge to the Boone Act in reliance upon Article II, Section 24 fails given that the Boone Act falls squarely within the General Assembly's authority regarding the "fixing of boundaries" pursuant to Article VII, Section 1 of the North Carolina Constitution.[14]

---

[14] The County echoes the State's substantive argument.

With respect to the sovereign immunity issue, the State contends that the Town failed to specifically allege a waiver of sovereign immunity in its complaint; that nothing in the relevant statutory provisions authorizes a municipality to file suit against the State; and that the Town does not have a valid constitutional claim sufficient to support a direct action against the State. In response, the Town asserts that it was not required to do anything other than allege a reasonable basis for determining that its claim is not barred by sovereign immunity. Moreover, the State's argument directed to the substance of the Town's claim does not serve the purpose for which sovereign immunity exists, which is to obviate the necessity for the State to defend itself in litigation in the absence of consent. The lack of any valid basis for the State's sovereign immunity argument is bolstered by the substantial number of decisions stemming from challenges to legislation asserted in reliance upon Article II, Section 24, none of which has suggested that such claims are barred by sovereign immunity. I do not find the State's sovereign immunity argument to be persuasive.

"Sovereign immunity stands for the proposition that . . . 'the State cannot be sued except with its consent or upon its waiver of immunity.'" *Dawes v. Nash County*, 357 N.C. 442, 445, 584 S.E.2d 760, 762 (2003) (quoting *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414 (1998), and citing *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 534, 299 S.E.2d 618, 625 (1983)). "[S]overeign immunity . . . 'is an *immunity from suit* rather than a mere defense to liability . . . .'" *Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 338, 678 S.E.2d 351, 354 (2009)

(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 425 (1985)). "[T]he doctrine of sovereign immunity . . . is a common law theory or defense established by this Court," so that, "when there is a clash between . . . constitutional rights and sovereign immunity, the constitutional rights must prevail." *Corum v. Univ. of N.C.*, 330 N.C. 761, 786, 413 S.E.2d 276, 292, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992).

The State's argument in reliance upon the Town's failure to specifically plead a waiver of sovereign immunity relies exclusively upon *Vest v. Easley*, in which the Court of Appeals noted that "[i]t is well-established law that with no allegation of waiver [of sovereign immunity] in a plaintiff's complaint, the plaintiff is absolutely barred from suing the state and its public officials in their official capacities in an action for negligence." 145 N.C. App. 70, 74, 549 S.E.2d 568, 573 (2001) (citations omitted). Instead of asserting a negligence-based claim for monetary damages such as the claim at issue in *Vest*, however, the Town has sought a declaration concerning the constitutionality of the Boone Act. "A declaratory judgment may be used to determine the construction and validity of a statute," *Town of Emerald Isle v. State*, 320 N.C. 640, 646, 360 S.E.2d 756, 760 (1987) (citing *City of Raleigh v. Norfolk S. Ry. Co.*, 275 N.C. 454, 168 S.E.2d 389 (1969)), with "a municipality [being entitled to] have its rights and obligations determined in a declaratory judgment action," *id.* at 646, 360 S.E.2d at 760 (citing *Bd. of Managers v. City of Wilmington*, 237 N.C. 179, 74 S.E.2d 749 (1953)). In light of that fact, this Court has regularly entertained

declaratory judgment actions against the State and its political subdivisions involving challenges to the constitutionality of legislation as violative of Article II, Section 24. *E.g., id.* at 645-52, 360 S.E.2d at 759-63; *Bd. of Managers*, 237 N.C. at 186-90, 74 S.E.2d at 754-57. On the other hand, the State has failed to identify a single decision of this Court holding that the Town was required to plead a waiver of sovereign immunity as a prerequisite for challenging the constitutionality of the Boone Act under Article II, Section 24 or that the doctrine of sovereign immunity presents any obstacle to our consideration of the merits of the Town's constitutional challenge.[15]

As previously noted, the State asserts that this Court's decisions under Article II, Section 24 have no bearing upon the sovereign immunity claim that it has advanced in this case because the constitutionality of the Boone Act is controlled by the boundary fixing provision of Article VII, Section 1, rather than Article II, Section 24. However, even when this Court has rejected constitutional claims predicated upon Article II, Section 24, those decisions rest upon substantive considerations rather than upon the doctrine of sovereign immunity, *see, e.g., Town of Emerald Isle*, 320 N.C. at 648-52, 360 S.E.2d at 761-63; *Cheape v. Town of Chapel Hill*, 320 N.C. 549, 557-60, 359 S.E.2d 792, 797-99 (1987), with such results obtaining even in cases involving challenges to legislation related to annexation and the creation or alteration

---

[15] Even if the Town was required to plead a waiver of sovereign immunity, I believe that its complaint satisfies this requirement given that a waiver of sovereign immunity is inherent in the very constitutional challenge that the Town asserted in its complaint.

of municipal boundaries, s*ee, e.g., Piedmont Ford Truck Sale*, 324 N.C. at 505, 380 S.E.2d at 111 (holding that a local act obligating the City of Greensboro to provide solid waste collection in newly annexed areas did not relate to health and sanitation for purposes of Article II, Section 24(1)(a), because it had the "effect" of making a general law of statewide application applicable to an annexation being effectuated by means of a local act and because the challenged legislation did not "subject the annexed area to a different treatment than" would have been the case if Greensboro "had annexed the area under the general annexation law"). As a result, our precedent indicates that the mere fact that a constitutional challenge to legislation advanced in reliance upon Article II, Section 24 proves unsuccessful does not establish that the underlying claim should have been dismissed on sovereign immunity grounds.

Aside from the fact that the Town was not required to allege or prove that a traditional cause of action exists under Article II, Section 24 in order to seek and obtain a declaration concerning the constitutionality of the Boone Act, *see Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760 (stating that a plaintiff seeking a judicial declaration "is not required to allege or prove that a traditional 'cause of action' exists against [a] defendant" (citing *Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 588, 347 S.E.2d 25, 31-32 (1986))), this Court has "clearly establish[ed] the principle that sovereign immunity [cannot] operate to bar direct constitutional claims," particularly if the plaintiff is left with "no adequate remedy at state law," *Craig*, 363 N.C. at 340, 678 S.E.2d at 356 (citing *Corum*, 330 N.C. at 782-

86, 413 S.E.2d at 289-92). Although this Court's decisions in *Corum*, 330 N.C. at 782-86, 413 S.E.2d at 289-92, and *Craig*, 363 N.C. at 338-42, 678 S.E.2d at 354-57, specifically mention the constitutional protections contained in the Declaration of Rights, no decision of this Court limits the applicability of the principle enunciated in those cases to the constitutional principles enunciated in Article I of the North Carolina Constitution. On the contrary, this Court held in *Craig* that the plaintiff was entitled to obtain a decision on the merits with respect to a claim advanced in reliance upon Article IX, Section 1 of the North Carolina Constitution, which provides that "schools, libraries, and the means of education shall forever be encouraged," in addition to the claims that he asserted pursuant to Article I, Sections 15 and 19 of the North Carolina Constitution. *Craig*, 363 N.C. at 335, 342, 678 S.E.2d at 352, 357. The prohibition against local legislation addressing certain subjects contained in Article II, Section 24 is an integral part of our State's fundamental law and should not be treated as of lesser importance. As a result, the doctrine of sovereign immunity does not bar the Town from asserting a claim against the State pursuant to Article II, Section 24.

In support of its contention that the Town lacks standing to challenge the constitutionality of the Boone Act, the State places principal reliance upon *Wood v. City of Fayetteville*, 43 N.C. App. 410, 259 S.E.2d 581 (1979), *appeal dismissed and disc. rev. denied*, 299 N.C. 125, 261 S.E.2d 926-27 (1980), in which the Court of Appeals held that the City of Fayetteville lacked standing to challenge certain

limitations that the General Assembly had imposed upon Fayetteville's annexation authority. According to the State, *Wood* and our decision in *In re Martin*, 286 N.C. 66, 209 S.E.2d 766 (1974), establish that a municipality, as a creature of the State, is only entitled to exercise those powers granted to it by the General Assembly and lacks the right to challenge the constitutionality of legislation enacted by the body that created it. Moreover, given that the ability of a municipality to exercise certain powers outside its corporate limits stems from a discretionary decision made by the General Assembly rather than from any vested right possessed by the municipality, any decision by the General Assembly to eliminate that municipality's authority to exercise extraterritorial jurisdiction cannot result in any injury to that municipality sufficient to give it standing to bring suit against the State. Finally, the State contends that there is no statutory support for the proposition that the Town has the authority to bring suit against the State on any basis.

After acknowledging that this Court has allowed municipalities to assert claims against it in the past, the State claims that these cases are distinguishable. For example, the State argues that, since this case is governed by the boundary fixing provision of Article VII, Section 1 rather than the limitations upon the enactment of local legislation contained in Article II, Section 24, it is clearly distinguishable from the cases in which municipalities have been allowed to challenge the constitutionality of legislation, such as *Town of Spruce Pine v. Avery County*, 346 N.C. 787, 488 S.E.2d 144 (1997), and *Town of Emerald Isle*, each of which involved the imposition of a new

obligation on a local government. Similarly, this case is deemed to be distinguishable from *City of New Bern v. New Bern–Craven County Board of Education*, 328 N.C. 557, 402 S.E.2d 623 (1991) (*New Bern I*), given that *New Bern I* did not stem from an action brought by a municipality against the State and given that the challenged legislation involved the removal of the city's authority to enforce the State Building Code within, rather than outside, its own municipal boundaries, coupled with a grant of authority to the county to enforce the building code within the municipal boundary contained in a local, rather than a general, law, *see* N.C.G.S. § 153A-320 (2015); *id.* § 160A-360(d) (2015). Finally, the State argues that, since there is no earlier decision of this Court arising from a challenge to the withdrawal of a municipality's extraterritorial jurisdiction, nothing forecloses the State's ability to challenge the Town's standing to prosecute the present litigation.

In response, the Town argues that *Wood* and *In re Martin* do not establish a standing rule of the breadth for which the State contends. Moreover, the Town contends that a series of decisions after *In re Martin*, including *Town of Emerald Isle*, *New Bern I*, and *Town of Spruce Pine*, fatally undermine the State's position. In the Town's view, these more recent decisions, especially *New Bern I*, demonstrate that a municipality has standing to challenge the constitutionality of legislation depriving it of the ability to exercise regulatory authority, that the General Assembly's authority to regulate municipal corporations is not without limit, and that allowing municipalities to challenge the constitutionality of legislation pursuant to Article II,

Section 24 is of critical importance given that "they are the best positioned—indeed, they are often the only parties positioned—to do so." Finally, the Town contends that the Boone Act is primarily concerned with powers rather than with boundaries and that the Court has rejected similar boundary-related arguments in the past, as is evidenced by our decision to invalidate the legislation at issue in *City of New Bern v. New Bern–Craven County Board of Education*, 338 N.C. 430, 450 S.E.2d 735 (1994) (*New Bern II*).

As this Court has previously stated, "[t]he 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation[ ] of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973) (quoting *Flast v. Cohen*, 392 U.S. 83, 99, 20 L. Ed. 2d 947, 961 (1968) (citation omitted)). According to N.C.G.S. § 1-254, "[a]ny person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder," N.C.G.S. § 1-254 (2015), in order "to settle and afford relief from uncertainty and insecurity, with respect to rights, status, and other legal relations," *Walker v. Phelps*, 202 N.C. 344, 349, 162 S.E. 727, 729 (1932).

"An action may not be maintained under the Declaratory Judgment Act . . . unless the action involves a present actual controversy between the parties." *Town of Emerald Isle*, 320 N.C. at 645-46, 360 S.E.2d at 760 (citing *City of Greensboro v. Wall*, 247 N.C. 516, 519, 101 S.E.2d 413, 416 (1958)); *see New Bern I*, 328 N.C. at 559, 402 S.E.2d at 624-25 (stating that, "in order to invoke the provisions of the Declaratory Judgment Act[,] there must be a justiciable controversy between the parties" (citations omitted)). "Although it is not necessary that one party have an actual right of action against another to satisfy the jurisdictional requirement of an actual controversy, it is necessary that litigation appear unavoidable." *Gaston Bd. of Realtors, Inc. v. Harrison*, 311 N.C. 230, 234, 316 S.E.2d 59, 61 (1984) (citation omitted). Litigation is unavoidable for declaratory judgment purposes in instances in which a "[c]ounty contends it has the right to enforce certain laws," and a "[c]ity says the [c]ounty does not have the right." *New Bern I*, 328 N.C at 561, 402 S.E.2d at 626. Thus, a municipality's challenge to the constitutionality of legislation affecting its legal position involves an actual or justiciable controversy cognizable under the Declaratory Judgment Act. *See, e.g.*, *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 198-99, 675 S.E.2d 641, 647-48 (2009) (concluding that a justiciable controversy existed between two governmental entities and sufficed to confer standing to seek and obtain a declaration concerning the nature and extent of their disputed powers and duties); *see also Town of Spruce Pine*, 346 N.C. at 790, 488 S.E.2d at 146 (concluding that Avery County had standing to seek a declaration

concerning the constitutionality of the Water Supply Watershed Protection Act in light of this Court's decisions in *New Bern I* and *Town of Emerald Isle*);[16] *Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760 (concluding that the Town had standing to seek a declaration concerning the constitutionality of legislation requiring the Town to maintain facilities providing pedestrian beach access because the action involved a present actual controversy between the parties (citation omitted)). As a result, the Town clearly has standing to seek a declaration concerning the constitutionality of the Boone Act.

The State's reliance upon *Wood* and *In re Martin* for standing-related purposes is misplaced. In *In re Martin*, this Court held, in the context of an administrative appeal, that a county lacked standing to challenge the constitutionality of a statute granting tax exemptions as violative of the uniform taxation provisions of Article V, Section 2 of the North Carolina Constitution. 286 N.C. at 71, 75-76, 209 S.E.2d at 770, 773. In the aftermath of *In re Martin*, this Court has allowed a municipality to challenge the constitutionality of a statute affecting its rights or status in a declaratory judgment action on multiple occasions. *E.g.*, *Town of Spruce Pine*, 346 N.C. at 790, 488 S.E.2d at 146; *New Bern I,* 328 N.C. at 558-61, 402 S.E.2d at 624-26;

---

[16] Although *Town of Spruce Pine* does not specifically state that the County's challenge to the constitutionality of the Water Supply Watershed Protection Act took the form of a declaratory judgment action, the Court of Appeals' decision clearly establishes that it did. 123 N.C. App. 704, 711, 475 S.E.2d 233, 237 (1996) (stating that, "[f]or standing in a declaratory judgment action, there must be a present, actual controversy at the time the pleading requesting declaratory relief is filed" (citing *Sharpe*, 317 N.C. at 584, 347 S.E.2d at 29)), *rev'd on other grounds*, 346 N.C. 787, 488 S.E.2d 144 (1997).

*Town of Emerald Isle*, 320 N.C. at 646, 360 S.E.2d at 760. *In re Martin* does not articulate a broad standing rule of the nature posited by the State. Instead, the Court's standing decision in *In re Martin* stemmed from the fact that, given that counties lack inherent taxing authority, they do not have a right to complain that the enabling legislation authorizing counties to tax personal property "is lacking in breadth," 286 N.C. at 74, 209 S.E.2d at 772; that the county, which was seeking to avail itself of the authority to tax personal property pursuant to the same legislation that it alleged to be unconstitutional, could "not accept the benefits of the taxing power conferred upon it by the statute and at the same time reject on constitutional grounds the statutory classification of property which 'shall not be assessed for taxation,' " *id.* at 75, 209 S.E.2d at 772 (citation omitted); and that the county was precluded from challenging the constitutionality of the statute in question because the "uniformity in taxation" requirement contained in Article V, Section 2 "relates to equality in the burden on the State's taxpayers" rather than the county's interest in collecting tax revenues, *id.* at 76, 209 S.E.2d at 773 (citation omitted). Thus, our decision in *In re Martin* rested on a number of factors, most of which provide no support for the State's position with respect to the standing issue.

Although the Court of Appeals focused its attention in *Wood* on the first of the three factors mentioned in *In re Martin*, 43 N.C. App. at 419, 259 S.E.2d at 586 (stating that, as was the case with Mecklenburg County in *In re Martin*, "the City of Fayetteville . . . is a creature of the legislature and an agency of the state" that "has

no inherent power to annex" and that, "[i]n light of *Martin*, . . . the City cannot question the limitations placed by the legislature on its power to annex" (internal citations omitted)), this Court is not bound by that decision.[17]  Contrary to the approach adopted in *Wood*, we have interpreted *In re Martin* as holding that a local government lacks standing to challenge the constitutionality of a statute in the event that it has accepted benefits arising from the same statute that it seeks to challenge. *See, e.g., Town of Spruce Pine*, 346 N.C. at 790, 488 S.E.2d at 146.[18]  Consistent with that interpretation of *In re Martin*, in *New Bern I*, 328 N.C. at 559, 402 S.E.2d at 625, this Court rejected the argument that a unit of local government lacks standing to seek a declaration concerning the constitutionality of a statute divesting it of existing regulatory authority on the theory that the local government has no inherent or "vested right" to exercise that authority.

In my opinion, the standing issue before the Court in this case is remarkably similar to the one that we resolved in favor of the municipality in *New Bern I*.  Like the powers at issue in this case, the inspection power at issue in *New Bern I* and *II* was a component of a bundle of regulatory powers that had been granted to municipalities by the General Assembly in Article 19 of Chapter 160A.  *See* N.C.G.S.

---

[17] The Court of Appeals has never cited *Wood* in any subsequent decision.

[18] Although *Wood* does not mention the "acceptance of a benefit" theory, Fayetteville was challenging the constitutionality of certain limitations that the General Assembly had placed upon the exercise of authority contained in the same statute upon which Fayetteville predicated its claim to have a right to annex the affected area.  As a result, the outcome reached in *Wood* is consistent with that compelled by the "acceptance of benefits" theory.

§§ 160A-360(a), -411 to -439 (2015).  Prior to the enactment of the legislation at issue in *New Bern I* and *II*, the city had the authority to conduct inspections pursuant to N.C.G.S. § 160A-411 and had, in fact, performed them.  *New Bern II*, 338 N.C. at 434, 450 S.E.2d at 738.  Although this Court recognized that the General Assembly had the authority to confer building and fire and safety code enforcement responsibility upon municipal governments and that the municipality had no inherent or vested right to exercise that authority, we held that the City had the right to seek a declaration of the extent, if any, to which the challenged legislation violated Article II, Section 24 on the grounds that the city "had the right to enforce the codes prior to the action by the General Assembly" and that this "change in" an enforcement responsibility that had "previously belonged to" the city could be challenged "under the Declaratory Judgment Act."  *New Bern I*, 328 N.C. at 559, 402 S.E.2d at 625 (citing *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. 140, 142-44, 16 S.E.2d 677, 678-79 (1941) (holding that legislation allowing the Nash County Board of Commissioners to veto the appointment of the county health officer by the county board of health and requiring that the appointment of the health officer be confirmed by the county commissioners was subject to constitutional challenge in a declaratory judgment action)).  In addition, we rejected an argument that the city lacked standing to bring a declaratory judgment action for the purpose of challenging the constitutionality of the legislation in question on the grounds that no duty was being imposed on the city by the challenged legislation, stating "[t]hat is not the test," that the city's "status

was changed by the acts of the General Assembly," and that the city "may challenge this change of status by an action for a declaratory judgment." *Id.* at 560, 402 S.E.2d at 625. Finally, this Court concluded in *New Bern I* that the parties' disagreement over the county's right to enforce the laws in question had no effect on the city's ability to maintain the present litigation. *Id.* at 561, 402 S.E.2d at 626. Thus, the fact that both the Town and the County claim the right to regulate land use in the Town's extraterritorial jurisdiction and the fact that the County has taken steps to resume exercising regulatory authority in the affected area establish that the Town and the County have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation[ ] of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Stanley*, 284 N.C. at 28, 199 S.E.2d at 650 (quoting *Flast* 392 U.S. at 99, 20 L. Ed. 2d at 961 (citation omitted)).

The State correctly notes that the facts at issue in *New Bern I* and *II* and the facts at issue here are different in that this case involves the removal of an entire bundle of powers, rather than a single power, from the authority that the General Assembly has delegated to the Town; that the enforcement authority at issue in this case, unlike the authority at issue in the *New Bern* cases, involves the exercise of regulatory authority in an area located outside of the municipality's corporate limits rather than inside those limits; that the legislation at issue in *New Bern I* and *II*, unlike the Boone Act, explicitly transferred enforcement authority from the

municipality to the county; and that the Town, unlike the municipality in *New Bern I* and *II*, was required to and did enact ordinances defining the area in which it intended to exercise extraterritorial jurisdiction as a prerequisite for exerting regulatory authority there. However, while these distinctions implicate facts that are relevant to a determination of the merits of the Town's challenge to the constitutionality of the Boone Act, I am unable to see how they have any bearing on the proper resolution of the standing issue in this case. Thus, for all these reasons, I believe that the State's challenge to the Town's standing to maintain the present action lacks merit.

The ultimate issue before us in this case is whether the constitutionality of the Boone Act should be evaluated on the basis of the General Assembly's authority to "provide for the organization and government and the fixing of boundaries," N.C. Const. art. VII, § 1, or the General Assembly's authority to "give such powers and duties" to local governments "except as otherwise prohibited by this Constitution." As a result of the fact that Article II, Section 24 was enacted for the purpose of placing certain limits on the authority retained by the General Assembly, including at least a portion of the authority recognized in Article VII, Section 1, I believe that a proper resolution of the issue before us requires a consideration of Article VII, Section 1, Article II, Section 24, and the decisions of this Court discussing the reach of the limitations on the legislative power to enact local legislation worked by Article II, Section 24. After conducting what I believe to be the required analysis, I am unable

to escape the conclusion that the logic adopted by the Court in upholding the Boone Act unduly enlarges the scope of the first portion of the first paragraph of Article VII, Section 1 and unduly narrows both the second part of the first paragraph of Article VII, Section 1 and the reach of the limitations on the scope of the legislative power set out in Article II, Section 24 in a manner that is not "in consonance with the objects and purposes in contemplation at the time of their adoption." *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953).

Since the adoption of our first constitution in 1776, the General Assembly has enjoyed considerable authority over units of local government. *See generally* John L. Sanders, *The Proposed Constitution of North Carolina: An Analysis*, 23 Popular Gov't 1, 9 (Feb. 1959) (noting that "North Carolina has a strong tradition of state legislative control and supervision of local government, both county and municipal," and that, "[f]rom 1776 until 1868, the Constitution left provision for and control of local government almost entirely in the hands of the General Assembly"). Although the delegates at the 1835 convention elected to propose constitutional amendments to prohibit "private laws" addressing a number of subjects, including the granting of requests for divorce, alimony, name changes, legitimation of individuals born out of wedlock, and restoration of citizenship rights of convicted felons, N.C. Const. of 1776, Amends. of 1835, art. I, §§ 3, 4, paras. 3-5, which were subsequently ratified by the voters, the delegates rejected a proposal that "[t]he General Assembly shall have no power to pass any private law to effect any object, that could be effected by a general

law on the same subject." *Proceedings and Debates of the Convention of North-Carolina [1835]* 379, 382 (Raleigh, Joseph Gales & Son 1836).

The 1868 Constitution provided that "[i]t shall be the duty of the Legislature to provide for the organization of cities, towns, and incorporated villages," N.C. Const. of 1868, art. VIII, § 4, without requiring the adoption of uniform legislation addressing that subject. Although the framers of the 1868 Constitution limited the enactment of such legislation with respect to private businesses, those limitations did not apply to municipal and public corporations. *Id.*, art. VIII, § 1 (providing that "[c]orporations may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the Legislature, the object of the corporations cannot be attained under general laws," with "[a]ll general laws and special acts passed pursuant to this Section" being subject to "alter[ation] from time to time or repeal[ ]"). In 1875, the General Assembly's authority over local governments was expanded, with the changes by which this policy was effectuated including the adoption of an amendment to Article VII of the Constitution of 1868 adding new language providing that "[t]he General Assembly shall have full power by statute to modify, change or abrogate any and all of the provisions of this article and substitute others in their place, except sections seven, nine and thirteen." *Id.*, Amends. of 1875, art. VII, § 14; *see generally* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 25-26 (2d ed. 2013) (stating that "[t]he principal aim" of these amendments "was to restore to the General

Assembly more of the power it had lost" in 1868 and that "the General Assembly regained its former power over local government" by means of Article VII, § 14).  The 1875 amendments to the constitutional provisions governing the relationship between the General Assembly and local government were adopted despite concerns that they would "abridg[e] the rights of the citizens by placing the government and organization of cities, towns, and &c., under the unlimited control of the Legislature." *Journal of the Constitutional Convention of the State of North Carolina* 162-63, 252 (Raleigh, Josiah Turner 1875).

The present version of the first paragraph of Article VII, Section 1 was recommended in the report of the North Carolina State Constitution Study Commission.  *Report of the North Carolina State Constitution Study Commission* 33, 90 (1968).  In support of this recommendation, the Commission noted that, given the version of Article VII adopted in 1875, the constitutional provisions governing the General Assembly's authority over local government, except for those relating to financial matters and providing for the office of Sheriff, were subject to modification by the General Assembly, which "ha[d] often exercised that power." *Id.* at 33.  "In view of this fact," the Commission recommended eliminating the provisions contained in Article VII that prescribed the General Assembly's authority over the organization and powers of local government to the extent that they were subject to modification by statute and inserting in their stead what is now the first paragraph of Article VII, Section 1, which the Commission depicted as "a general description of the General

Assembly's power to provide for the organization and powers of local government" that, instead of constituting "a delegation of power to the General Assembly," "merely [recognizes] . . . the [General Assembly's] power in this regard." *Id.* The Commission's recommended modifications to the constitutional provisions relating to the General Assembly's authority over local governments were not "calculated . . . to bring about any fundamental change in the power of state and local government or the distribution of that power." *Id.* at 4. Those amendments were submitted for ratification by the voters, approved at the 1970 general election, and became effective on 1 July 1971, Act of July 2, 1969, ch. 1258, secs. 1, 2, 4, 1969 N.C. Sess. Laws 1461, 1479, 1484. As a result, the General Assembly's well-established and long-standing authority over the organization and powers of local government currently appears in, while antedating, Article VII, Section 1, which provides, in pertinent part, that:

> The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.

N.C. Const. art. VII, § 1.

Article II, Section 24 expressly precludes the General Assembly from "enact[ing] any local, private, or special act or resolution" concerning fourteen "[p]rohibited subjects." Among other things, Article II, Section 24 provides that:

(1) Prohibited subjects. – The General Assembly shall not enact any local, private, or special act or resolution:

(a) Relating to health, sanitation, and the abatement of nuisances;

. . . .

(e) Relating to non-navigable steams;

. . . .

(j) Regulating labor, trade, mining, or manufacturing;

. . . .

(3) Prohibited acts void. – Any local, private, or special act or resolution enacted in violation of the provisions of this Section shall be void.

N.C. Const. art. II, § 24(1)(a), (3). Although the General Assembly is prohibited from "enact[ing] any local, private, or special act" regarding any of the fourteen subjects listed in Article II, Section 24(1) "by the partial repeal of a general law," *id.* § 24(2), the General Assembly "may . . . repeal local, private, or special laws enacted by it," *id.*, and "enact general laws regulating the matters set out" in the relevant constitutional provision, *id.* art. II, § 24(4).

Article II, Section 24, which was Article II, Section 29 at the time of its original adoption, was one of three constitutional amendments seeking to curtail local, private, and special legislation that were submitted for ratification by the General Assembly in 1915, were ratified by the people on 7 November 1916, and became

effective on 10 January 1917. *See* Act of Mar. 9, 1915, ch. 99, secs. 1, 8, 1915 N.C. Pub. [Sess.] Laws 148, 148-49, 151; *see also Kornegay v. City of Goldsboro*, 180 N.C. 441, 449, 105 S.E. 187, 191 (1920) (describing the adoption of former Article II, Section 29; Article VIII, Section 1; and former Article VIII, Section 4 as "a complete and comprehensive scheme" intended to "remedy" the "fully realized . . . evils of special, local, and private acts" and "to get rid of special legislation as far as practicable").[19] As the history of Article II, Section 24 demonstrates:

> The organic law of the State was originally drafted
> and promulgated by a convention which met at Halifax in

---

[19] Article VIII, Sections 1 and 4 provided, after the adoption of the 1916 amendments, that:

> Section 1. No corporation shall be created nor shall its charter be extended, altered, or amended by special act, except corporations, for charitable, educational, penal, or reformatory purposes that are to be and remain under the patronage and control of the State; but the General Assembly shall provide by general laws for the chartering and organization of all corporations, and for amending, extending, and forfeiture of all charters, except those above permitted by special act. All such general laws and special acts may be altered from time to time or repealed; and the General Assembly may at any time by special act repeal the charter of any corporation.
>
> . . . .
>
> [Section 4.] It shall be the duty of the Legislature to provide by general laws for the organization of cities, towns, and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessment and in contracting debts by such municipal corporations.

Ch. 99, sec. 1, 1915 N.C. Pub. [Sess.] Laws at 149. This Court held, in a sharply divided opinion, that Article VIII, Section 1 only applied to "private or business corporations, and does not refer to public or *quasi*-public corporations acting as governmental agencies," *Kornegay*, 180 N.C. at 446, 105 S.E. at 189 (quoting *Mills v. Bd. of Comm'rs*, 175 N.C. 215, 219, 95 S.E. 481, 482 (1918)), and that, since the general law provision contained in Article VIII, Section 4 was directory, rather than mandatory, *id.* at 448, 105 S.E. at 190, it did not prevent the enactment of local or special legislation governing the organization and operation of municipal governments, *id.* at 448-50, 105 S.E. at 190-91. Article VIII, Section 4 was deleted from the North Carolina Constitution when Article VII, Section 1 was adopted. Ch. 1258, sec. 1, 1969 N.C. Sess. Laws at 1479.

December, 1776. During the ensuing 140 years, the Legislature of North Carolina possessed virtually unlimited constitutional power to enact local, private, and special statutes. This legislative power was exercised with much liberality, and produced a plethora of local, private, and special enactments. As an inevitable consequence, the law of the State was frequently one thing in one locality, and quite different things in other localities. To minimize the resultant confusion, the people of North Carolina amended their Constitution at the general election of 1916 so as to deprive their Legislature of the power to enact local, private, or special acts or resolutions relating to many of the most common subjects of legislation.

. . . .

In thus amending their organic law, the people were motivated by the desire that the General Assembly should legislate for North Carolina in respect to the subjects specified as a single united commonwealth rather than as a conglomeration of innumerable discordant communities. To prevent this laudable desire from degenerating into a mere pious hope, they decreed in emphatic and express terms that "any local, private, or special act or resolution passed in violation of the provisions of this section shall be void[.]"

*Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 185-86, 581 S.E.2d 415, 426-27 (2003) (first alteration in original) (quoting *Idol v. Street*, 233 N.C. 730, 732-33, 65 S.E.2d 313, 314-15 (1951) (quoting N.C. Const. of 1868, art. II, § 29 (1917) (now art. II, § 24(3)))).

It was the purpose of the amendment to free the General Assembly from the enormous amount of petty detail which had been occupying its attention, to enable it to devote more time and attention to general legislation of statewide interest and concern, to strengthen local self-government by providing for the delegation of local matters by *general laws* to local authorities, and to require uniform and

> coordinated action under general laws on matters related
> to the welfare of the whole State.

*High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 656, 142 S.E.2d 697, 702 (1965).

Although the majority posits that Article VII, Section 1 is more recent in time than Article II, Section 24 and, consequently, that the provisions in Article VII, Section 1 are to be given their "full application" to the extent there is any conflict between these two constitutional provisions, I am unable to agree with this logic. As was noted above, the modifications to Article VII that led to the enactment of the first paragraph of Article VII, Section 1 were not "calculated . . . to bring about any fundamental change in the power of state and local government or the distribution of that power." *Report of the North Carolina State Constitution Study Commission* 4. In other words, Article VII, Section 1 was not designed to effectuate any substantive change to the General Assembly's authority over units of local government and did nothing more than reflect the same legislative authority that existed when Article II, Section 24 was adopted, effectively making Article II, Section 24, rather than Article VII, Section 1, more recent in time. As a result, given that the enactment of Article VII, Section 1 did not have the effect of changing existing North Carolina law, Article II, Section 24 and this Court's decisions construing it remain critical to a proper resolution of this case.

As noted earlier, the State and County argue that the exercise of extraterritorial jurisdiction constitutes the "fixing of boundaries" for purposes of Article VII, Section 1, rendering the limitations on local legislation imposed by Article

II, Section 24 inapplicable to the Boone Act, a proposition with which the Court appears to agree. Although the Town acknowledges that Article VII, Section 1 gives the General Assembly plenary authority over municipal boundaries, it contends that the "boundaries" referenced in the relevant constitutional provision are the municipal boundaries that are fixed at the time of initial incorporation or by means of subsequent charter amendments or annexations rather than the area within which a municipality is authorized to exercise extraterritorial jurisdiction; that extraterritorial jurisdiction relates to regulatory power or authority rather than the establishment of municipal boundaries; that the establishment and exercise of extraterritorial jurisdiction is materially different from the initial establishment or subsequent alteration of municipal boundaries; and that any alteration in the regulatory authority that the Town is entitled to exercise is subject to constitutional limitations, such as those contained in Article II, Section 24, on the General Assembly's authority to "give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable," N.C. Const. art. VII, § 1. I find this interpretation of Article VII, Section 1 persuasive.

Neither the State, the County, nor the Court point to any cases holding that the exercise of extraterritorial land use regulatory authority constitutes the "fixing of boundaries" for purposes of Article VII, Section 1. The only reason that a municipality is required to define the area in which it is entitled to exercise extraterritorial jurisdiction is to specify the location or locations within which the

municipality can take a limited number of actions that could not otherwise be taken there with respect to regulation of the planning, development, and use of land, including (1) the subdivision of land, N.C.G.S. §§ 160A-371 to -377 (2015); (2) zoning, *id.* §§ 160A-381 to -393 (2015); (3) historic districts and landmarks, *id.* §§ 160A-400.1 to -400.15 (2015); (4) private development agreements, *id.* §§ 160A-400.20 to -400.32 (2015); (5) wireless telecommunications facilities, *id.* §§ 160A-400.50 to -400.53 (2015); (6) the acquisition of open space, *id.* §§ 160A-401 to -407 (2015); (7) building inspections, *id.* §§ 160A-411 to -439 (2015); (8) minimum housing standards, *id.* §§ 160A-441 to -450 (2015); and (9) community appearance standards, *id.* §§ 160A-451 to -455 (2015), as well as certain other "[m]iscellaneous [p]owers" delineated in Part 8 of Article 19 of Chapter 160A, such as community development programs and activities, the acquisition and disposition of property for redevelopment, urban development action grants, and urban homesteading programs, *id.* §§ 160A-456 to -457.2 (2015); erosion and sedimentation control, *id.* § 160-458 (2015); floodway regulation, *id.* § 160A-458.1 (2015); mountain ridge protection, *id.* § 160A-458.2 (2015); downtown development projects, *id.* § 160A-458.3 (2015); designation of transportation corridor official maps, *id.* § 160A-458.4 (2015); stormwater control, *id.* § 160A-459 (2015); and programs to finance energy improvements, *id.* § 160A-459.1 (2015). *See* David W. Owens, Univ. of N.C. Sch. of Gov't, *Land Use Law in North Carolina* 31 & n.47 (2d ed. 2011) (stating that, "[w]hen a city adopts an extraterritorial boundary ordinance, the city acquires jurisdiction for all of its

ordinances adopted under Article 19 of Chapter 160A of the General Statutes" (citing N.C.G.S. § 160A-360(a)); *see also id.* at 30 (discussing how concerns about "chaotic" development "along the urban fringe, often in unregulated areas just outside of city corporate limits," resulted in the General Assembly's decision to authorize cities to implement " 'perimeter zoning,'  which is now known as municipal extraterritorial jurisdiction").  On the other hand, the initial creation of municipal boundaries and the process of extending those boundaries through boundary extension legislation or annexation results in the identification of those individuals entitled to vote in municipal elections and receive municipal services and required to pay municipal taxes and to be subject to the full panoply of the municipality's authority.  *See, e.g.*, N.C.G.S. § 160A-31 (2015) (annexation by petition); Frayda S. Bluestein, *Incorporation, Annexation, and City–County Consolidation, in County and Municipal Government in North Carolina* 15, 17-24 (Frayda S. Bluestein ed., 2d ed. 2014) [hereinafter *County and Municipal Government*] (discussing the various forms of statutorily authorized annexation, required provision of governmental services, and taxation of newly annexed property); Trey Allen, *General Ordinance Authority*, *in County and Municipal Government*, 77, 84 (stating that, "[f]or the most part, a city's police power ordinances apply only within the corporate limits and to any city-owned property or right-of-way outside the city," although "[a] city may enforce zoning and other development ordinances inside its corporate limits and within its extraterritorial jurisdiction" (citing N.C.G.S. § 160A-176 (2013)).  Thus, even though

a municipality must define the boundary within which it intends to exercise extraterritorial regulatory authority, the enforcement of those powers, rather than the establishment of a territorial boundary, is the defining characteristic of extraterritorial jurisdiction, rendering legislative decisions relating to the exercise of extraterritorial jurisdiction subject to constitutional limitations not applicable to legislation prescribing and governing the establishment of municipal boundaries. *New Bern II*, 338 N.C. at 438, 450 S.E.2d at 740 (rejecting the county's argument that local legislation removing the city's authority to conduct building code inspections relating to certain properties located within the city's corporate limits and shifting that authority to the county was within the General Assembly's "plenary powers to enact local laws pursuant to Article VII, Section 1" (citing *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989))).

In addition, the Court holds that the Boone Act is not subject to the limitations upon the enactment of local legislation contained in Article II, Section 24 because extraterritorial jurisdiction implicates the "organization and government" of units of local government as authorized by Article VII, Section 1,[20] and that the Boone Act "is an exercise of the General Assembly's plenary authority to 'provide for the organization and government and fixing of boundaries' of local government under the first clause of Article VII, Section 1." However, the Court has not cited any prior

---

[20] Neither the State nor the Town argued that the Boone Act involves the "organization and government" of local governments as provided for in Article VII, Section 1.

decisions of this Court holding that the limitations imposed by Article II, Section 24 do not apply to legislation, such as the Boone Act, effectuating what amounts to the reassignment of local government jurisdiction over particular subjects of regulation, or that the "powers and duties" which the General Assembly is authorized to delegate to local governments pursuant to Article VII, Section 1 are not subject to the limitations upon legislative authority imposed by Article II, Section 24, and I know of none. On the contrary, this Court has repeatedly invalidated local acts changing the existing assignment of regulatory authority among units of local government as violative of Article II, Section 24.

A careful review of this Court's decisions concerning Article II, Section 24 demonstrates that we have repeatedly held that the enactment of local legislation which had the effect of shifting, reassigning, or re-delegating the authority to regulate certain activities from one unit of local government to another violated Article II, Section 24 without ever stating that the analysis required by Article II, Section 24 is limited to instances involving the exercise of "power" separate and apart from the reassignment of regulatory jurisdiction. For example, we have held that local legislation transferring the authority to enforce health and safety regulations from one local government entity to another was invalid pursuant to Article II, Section 24. *See, e.g.*, *New Bern II*, 338 N.C. at 440, 450 S.E.2d at 741 (invalidating legislation that shifted responsibility for enforcing the State Building Code by expanding Craven County's jurisdiction to include certain properties located within New Bern's

municipal corporate boundaries as impermissible local legislation relating to health and sanitation); *see also Idol*, 233 N.C. at 733, 65 S.E.2d at 315 (finding it "clear beyond peradventure" that legislation authorizing the consolidation of the Winston-Salem and Forsyth County health departments and providing for the appointment of a joint city-county board to administer the public health laws in the affected jurisdictions constituted a prohibited "local act relating to health"); *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. at 143, 16 S.E.2d at 679 (emphasizing our "commit[ment] to the proposition that a law affecting the selection of officers to whom is given the duty of administering the health laws is a law 'relating to health' " while invalidating a local law requiring that the county health officer appointed by the county board of health be confirmed by the Nash County Board of Commissioners (citing *Sams v. Bd. of Cty. Comm'rs*, 217 N.C. 284, 285, 7 S.E.2d 540, 541 (1940))); *Sams*, 217 N.C. at 285-86, 7 S.E.2d at 541 (concluding that a local act "undertak[ing] to create for Madison County, alone, a county board of health and to name its members" "conflict[ed] with the constitutional restrictions upon the power of the General Assembly imposed by" Article II, Section 24). The Court's decision that the Boone Act is not subject to the limitations upon the enactment of local legislation spelled out in Article II, Section 24 conflicts with the clear import of these decisions.

As support for its broad interpretation of "organization and government" as used in the first part of the first paragraph of Article VII, Section 1, the Court conducts a plain language analysis focusing upon dictionary definitions of the

relevant words. However, the plain language in which the provision in question is couched suggests to me that the phrase "organization and government" refers to the creation of units of local government and the manner in which those units of local government are governed rather than the powers that those units are entitled to exercise. My interpretation is fully consistent with the numerous decisions upon which the Court relies, almost all of which relate to the establishment of municipal boundaries or the creation or abolition of units of local government, rather than to the authority that units of local government are entitled to exercise. Unlike the majority's interpretation, this interpretation of "organization and government" also avoids overly narrowing or eviscerating the "powers and duties" language contained in the second part of the first paragraph of Article VII, Section 1, *see Bd. of Educ. v. Bd. of Comm'rs*, 137 N.C. 310, 312, 49 S.E. 353, 354 (1904) (stating that, "[i]f different portions [of the state constitution] seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory" (quoting Thomas M. Cooley, *Cooley's Constitutional Limitations* 92 (7th ed. 1903))); *see also Lacy v. Fid. Bank of Durham*, 183 N.C. 374, 380, 111 S.E. 612, 615 (1922) (stating that the constitution should be "construed so as to allow significance to each and every part of it if this can be done by any fair and reasonable intendment" (citation omitted)), and does not conflict with the numerous decisions invalidating local government reorganizations cited in the preceding paragraph. As a result, for all

these reasons, I cannot agree that the Boone Act constitutes a valid exercise of the

General Assembly's authority to provide for the "organization and government" of

local governmental bodies.

Even if the enactment of local legislation eliminating the Town's authority to

exercise extraterritorial jurisdiction constitutes the alteration of municipal corporate

boundaries and the exercise of the General Assembly's authority over the

"organization and government" of units of local government, our opinion in *Piedmont*

*Ford Truck Sale* indicates that the limitations on the enactment of local legislation

imposed by Article II, Section 24 remain relevant.  In that case, the owners of recently

annexed property challenged the validity of a local act authorizing the City of

Greensboro to annex certain land contiguous to Greensboro's existing corporate

limits, contending, among other things, that the challenged legislation constituted an

impermissible local law relating to health and sanitation in violation of Article II,

Section 24(1)(a).[21]  324 N.C. at 500, 380 S.E.2d at 108.  In rejecting the property

owners' challenge to the validity of the legislation in question, which, like the

challenge advanced by the Town in this case, rested upon the powers or duties that

the Greensboro would be required to exercise (or precluded from exercising) in the

---

[21] The language quoted by the Court from *Piedmont Ford Truck Sale* does not appear in that portion of our opinion addressing the property owners' claim in reliance upon Article II, Section 24.  324 N.C. at 502, 380 S.E.2d at 109 (stating that "[t]he extension of boundaries of cities has been held to be a political decision which is not protected by the United States Constitution or the Constitution of North Carolina" in addressing the property owners' argument in reliance on the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution (citations omitted)).

relevant area, we acknowledged that the alteration and extension of Greensboro's municipal corporate boundaries fell within the ambit of Article VII, Section 1. *Id.* at 501-02, 380 S.E.2d at 109. In spite of the fact that the legislation at issue in that case constituted "the fixing of boundaries" for purposes of Article VII, Section 1 and effectuated what the Court has labeled in this case as a restructuring of the regulatory jurisdiction made available to the City of Greensboro by subjecting the annexed territory and those persons living within it to the full panoply of rights, obligations, and regulations available to and imposed upon City residents, this Court did not refrain from conducting an Article II, Section 24 analysis, as consistency with the Court's decision in this case would seem to require. Instead, we proceeded to analyze the substance of the property owners' contention that the legislation in question, which required the City to provide solid waste collection service in the newly annexed territory, constituted impermissible local legislation relating to health and sanitation in violation of Article II, Section 24(1)(a). *Id.* at 504-05, 380 S.E.2d at 110-11. Although we ultimately held that the legislation in question did not violate Article II, Section 24(1)(a), *id.* at 505-06, 380 S.E.2d at 110-11, the fact that we reached the merits of the property owners' claim under Article II, Section 24 suggests that a local act that alters local government jurisdictional boundaries and reorganizes units of local government is not immune from challenge under Article II, Section 24. Thus, even if the Boone Act amounted to a revision of municipal boundaries or the organization of local government, *Piedmont Ford Truck Sale* suggests that the

limitations upon the enactment of local legislation enunciated in Article II, Section 24 remain applicable in the event that the legislation in question has the effect of altering the local government's powers or duties relating to prohibited subjects such as health, sanitation, and the abatement of nuisances. As a result, for all these reasons, I believe that we are required to address the merits of the Town's challenge to the Boone Act under Article II, Section 24.

The first step in determining whether the Boone Act violates Article II, Section 24 would ordinarily be for us to decide whether the Boone Act "is a *local act* prohibited by Article II, section 24 of the Constitution" or "a *general law* which the General Assembly has the power to enact." *Adams*, 295 N.C. at 690, 249 S.E.2d at 406. In this case, however, the State and the County have conceded that the Boone Act is a local act.[22] As a result, we need only determine whether the Boone Act "[r]elat[es] to health, sanitation, and the abatement of nuisances," N.C. Const. art. II, § 24(1)(a),

---

[22] The parties have made conflicting assertions about the origin of the Town's authority to exercise extraterritorial jurisdiction. In 1959, the General Assembly authorized municipalities with populations of "2,500 or more" in eighty-one counties to "adopt[ ] zoning regulations" "extending for a distance of one mile beyond [their corporate] limits in all directions." Act of June 19, 1959, ch. 1204, sec. 1, 1959 N.C. Sess. Laws 1354, 1354-55 (codified at N.C.G.S. § 160-181.2 (1959)). However, municipalities located in eighteen counties, including Watauga, were specifically excluded from the coverage of this legislation. *Id.*, sec. 1, at 1355. In 1961, the General Assembly authorized municipalities with a population of 1,250 or more to exercise extraterritorial jurisdiction and eliminated the exclusion for municipalities located in Watauga County. Act of May 30, 1961, ch. 548, secs. 1, 1¾, 1961 N.C. Sess. Laws 748 (amending N.C.G.S. § 160A-181.2 (1959)). In view of the fact that an act "eliminating a county from a list of [counties] excepted" and "making the provisions of" a general law applicable to that county is "tantamount to a re-enactment of the general law making it applicable" to the county in question rather than a local law, *State v. Ballenger*, 247 N.C. 216, 217-18, 100 S.E.2d 351, 353 (1957), the 1961 Act appears to have been a general, rather than a local, law.

"[r]elat[es] to non-navigable streams," *id.* § 24(1)(e), or "[r]egulat[es] labor, trade, mining, or manufacturing," *id.* § 24(1)(j).

Although the stated purpose of a local act and its substantive provisions are undoubtedly relevant to the determination of whether a local law violates Article II, Section 24(1), *City of Asheville v. State*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (Dec. 21, 2016) (93A15-2), our recent precedent clearly indicates that the practical effect of the challenged legislation is pertinent to, and perhaps determinative of, the required constitutional inquiry, *e.g.*, *Williams*, 357 N.C. at 189, 581 S.E.2d at 429 (concluding that, while "the record demonstrates that . . . the intent of the enabling legislation and the Ordinance [enacted pursuant to the challenged legislation] is to prohibit discrimination in the workplace, the effect of these enactments is to govern the labor practices of [certain businesses] in Orange County"); *New Bern II*, 338 N.C. at 433-42, 450 S.E.2d at 737-42 (concluding that legislation shifting the responsibility for enforcing the State Building Code with respect to certain buildings from the City of New Bern to Craven County constituted unconstitutional local acts related to health and sanitation). Thus, we must determine the extent to which the Boone Act impermissibly impinges upon one of the subjects about which the General Assembly lacks the authority to enact local legislation by examining the stated purpose of the challenged legislation, the content of its substantive provisions, and the practical effect that the challenged legislation will have if it is allowed to go into effect.

As we noted in *City of Asheville*, this Court has not, to date, clearly indicated when a local act does and does not "relate" to a prohibited subject for purposes of Article II, Section 24.  For the reasons set forth in that decision, the issue of whether a local law relates to one of the prohibited subjects enumerated in Article II, Section 24 requires us to consider whether, in light of its stated purpose and practical effect, the Boone Act has a material, but not exclusive or predominant, connection to one of those purposes.  In undertaking the required analysis in a case, such as this one, which involves legislation implicating a broad range of issues rather than a single subject that has been subject to a facial, rather than an as-applied challenge, I believe that we are required to evaluate the challenged legislation as a whole and to ascertain the materiality of the relationship between the challenged legislation and the prohibited subjects delineated in Article II, Section 24 by determining whether the challenged legislation, considered in its entirety, has a material relationship to one or more of those prohibited subjects.[23]  Any other approach will fail to honor the presumption of constitutionality to which legislation enacted by the General Assembly is entitled and result in a mistaken understanding of the genuine purpose for and practical effect of the challenged legislation.

---

[23] The applicability of the analytical approach that I deem appropriate in this case hinges upon the fact that the General Assembly has treated the range of issues about which a municipality would ordinarily be entitled to exercise regulatory authority as a unified whole.  In other words, the applicable legislation authorizes a municipality, in the exercise of its discretion, to do a number of different things in regulating land use in its extraterritorial jurisdiction without in any way indicating that the availability of these different types of regulatory authority should be treated as severable.  A subject-by-subject approach would, of course, be perfectly permissible in the event that the challenged legislation addressed a number of discrete issues that the General Assembly has not linked together.

Unlike the situation with respect to the legislation at issue in *City of Asheville*, the Boone Act lacks a statement of the purpose that motivated the General Assembly's decision to eliminate the Town's ability to exercise extraterritorial jurisdiction. However, the clear effect of the General Assembly's decision to enact the Boone Act is to prevent the Town from regulating certain activities in the existing extraterritorial area and to preclude the Town from exercising such authority in additional areas in the future. Although the Boone Act does not explicitly "undo" the designation of the extraterritorial areas in which the Town was entitled to exercise regulatory jurisdiction, *see* Act of June 26, 2014, ch. 33, sec. 1, 2013 N.C. Sess. Laws (Reg. Sess. 2014) 139, 140 (stating that "the Town of Boone shall not exercise any powers of extraterritorial jurisdiction as provided in Article 19 of Chapter 160A of the General Statutes"), I am not convinced that the General Assembly intended to create a zone in which no local governmental entity has the ability to exercise regulatory authority. For that reason, I see no basis for believing that the General Assembly intended to do anything other than to transfer regulatory authority with respect to the affected area from the Town to the County. *See* N.C.G.S. § 153A-320 (stating that "[e]ach of the powers granted to counties by this Article and by Article 19 of Chapter 160A of the General Statutes may be exercised throughout the county except as otherwise provided in G.S. 160A-360); *id.* § 160A-360(f1) (2015) (stating that, "[w]hen a city relinquishes jurisdiction over an area that it is regulating under this Article to a county, the city regulations and powers of enforcement shall remain in effect until

(i) the county has adopted this regulation or (ii) a period of 60 days has elapsed following the action by which the city relinquished jurisdiction"); *cf. id.* § 160A-360(d) (stating that, in the event that "a city fails to adopt an ordinance specifying the boundaries of its extraterritorial jurisdiction, the county of which it is a part shall be authorized to exercise the powers granted by [Article 19] in any area beyond the city's corporate limits"). As a result, this Court must evaluate the extent to which the entire bundle of powers removed from the Town and transferred to the County has a material connection to one of the prohibited purposes set out in Article II, Section 24, rather than the extent to which any isolated power which the Town is prevented from exercising by the Boone Act relates to a prohibited purpose.

In seeking to persuade this Court that the Boone Act relates to health, sanitation, and the abatement of nuisances, the Town relies upon a number of statutory provisions, including N.C.G.S. § 160A-381 (granting zoning authority to municipalities "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community" and authorizing municipalities to regulate and restrict the height, number of stories, and size of buildings and other structures; the percentage of lots that may be occupied; the size of yards, courts, and other open spaces; population densities; and the location and use of buildings, structures and land); *id.* § 160A-383 (providing that "[z]oning regulations shall be designed to promote the public health, safety, and general welfare" and may address issues such as the provision of "adequate light and air"; the prevention of "overcrowding of land";

avoiding undue population concentration; lessening street congestion; securing "safety from fire, panic, and dangers"; and facilitating the "provision of transportation, water, sewerage, schools, parks, and other public requirements"); *id.* § 160A-383.4 (authorizing regulations seeking to reduce the amount of energy consumption through the use of measures like density bonuses and similar incentives); *id.* § 160A-412(a) (providing for the enforcement of state laws and local ordinances relating to the "construction of buildings and other structures"; the installation of facilities such as plumbing, electrical, and air-conditioning systems; the "safe, sanitary, and healthful" "maintenance of buildings and other structures"; and other issues specified by the city council); *id.* § 160A-424(a) (providing that "[t]he inspection department may make periodic inspections, subject to the council's directions, for unsafe, unsanitary, or otherwise hazardous and unlawful conditions in buildings or structures within its territorial jurisdiction"); *id.* § 160A-426(b) (providing that "an inspector may declare a nonresidential building or structure within a community development target area to be unsafe if" it "appears . . . to be vacant or abandoned" and "appears . . . to be in such dilapidated condition as to cause or contribute to blight, disease, vagrancy, fire or safety hazard, to be a danger to children, or to tend to attract persons intent on criminal activities or other activities that would constitute a public nuisance"); *id.* § 160A-432(c) (stating that "[n]othing in this section shall be construed to impair or limit the power of the city to define and declare nuisances and to cause their removal or abatement by summary proceedings,

or otherwise"); *id.* § 160A-439(a) (authorizing the adoption of ordinances providing for the repair, closing, and demolition of nonresidential buildings or structures "that fail to meet minimum standards of maintenance, sanitation, and safety established by the governing body"); and *id.* § 160A-441 (finding "that the existence and occupation of dwellings in this State that are unfit for human habitation are inimical to the welfare and dangerous and injurious to the health, safety and morals of the people" and "that a public necessity exists for the repair, closing or demolition of such dwellings"). Although the statutory provisions upon which the Town relies clearly implicate issues relating to health, sanitation, and the abatement of nuisances, I do not believe the Boone Act, when considered as an integrated whole, has a material relation to health, sanitation, and the abatement of nuisances.

As an initial matter, many of the statutory provisions to which the Town has directed our attention essentially amount to assertions that the statute in question has been enacted pursuant to the State's police power. *City of Raleigh v. Norfolk S. Ry. Co.*, 275 N.C. at 460-61, 168 S.E.2d at 394 (stating that "[t]he General Assembly may delegate to a municipality, as an agency of the State, authority to enact ordinances in the exercise of the police power" (citation omitted)); *State v. Ballance*, 229 N.C. 764, 769, 51 S.E.2d 731, 734-35 (1949) (stating that the "police power" authorizes the "enact[ment of] laws, within constitutional limits, to protect or promote the health, morals, order, safety, and general welfare of society" and that, for "a statute . . . to be sustained as a legitimate exercise of the police power, it must

have a rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare" (citations omitted)). Although the presence of language invoking the police power is certainly relevant to the inquiry that must be conducted pursuant to Article II, Section 24(1)(a), *New Bern II*, 338 N.C. at 439-40, 450 S.E.2d at 740-41, the ubiquity with which such language appears in the General Statutes makes it difficult for me to treat its presence as determinative for the purpose of ascertaining whether a particular piece of legislation relates to any prohibited subjects listed. As noted by a leading scholar cited with regularity by this Court, *see, e.g., Adams*, 295 N.C. at 690-91, 249 S.E.2d at 407, using "[t]he recital of legislative intent in" a statute that simply reflects "standard boiler plate language used to invoke the exercise of the police power of the state in the protection of the public health, safety and morals" to bring an act within the coverage of Article II, Section 24 "would cast doubt on the validity of any exercise of the police power in less than all the counties should the General Assembly employ" words such as " 'health' in the usual descriptive formula." Joseph S. Ferrell, *Local Legislation in the North Carolina General Assembly*, 45 N.C. L. Rev. 340, 396 (1967) (noting this Court's reliance upon such language in *State ex rel. Carringer v. Alverson*, 254 N.C. 204, 207, 118 S.E.2d 408, 410 (1961), to support a determination that legislation allowing municipalities with a population of 500 or more in fourteen named counties to create a housing authority related to health and sanitation for purposes of what is now Article II, Section 24(1)(a) and stating that "[a]n extension of *Carringer* would cast doubt on the

validity of any exercise of the police power in less than all the counties should the General Assembly employ the word 'health' in the usual descriptive formula").[24] Thus, the fact that the statutory provisions that a municipality is entitled to enforce while exercising extraterritorial jurisdiction were enacted pursuant to the police power should not obscure our obligation to examine the Boone Act in its entirety.

Upon examining the practical effect of the Boone Act in its entirety, one cannot escape the conclusion that, while portions of the zoning, building code, housing quality, and urban development regulations that the Town enforces in its extraterritorial jurisdiction clearly implicate health, sanitation, and the abatement of nuisances, the other powers that the Town is entitled to exercise on an extraterritorial basis do not have such a clear relationship to those subjects. For example, it is not clear to me that extraterritorial regulation of subdivisions, N.C.G.S. §§ 160A-371 to -377; historic districts and landmarks, *id.* §§ 160A-400.1 to -400.15; private development agreements, *id.* §§ 160A-400.20 to -400.32; wireless communications facilities, *id.* §§ 160A-400.50 to -400.53; open spaces, *id.* §§ 160A-401 to -407; community appearance commissions, *id.* §§ 160A-451 to -455; mountain ridges, *id.* § 160A-458.2; transportation corridor maps, *id.* § 160A-458.4; downtown development, *id.* § 160A-458.3; and energy improvements, *id.* § 160A-459.1 have much, if anything, to do with health, sanitation, and the abatement of nuisances. In

---

[24] The statement from *State ex rel. Carringer* discussed in the text constituted mere dicta given our holding that the trial court should have dismissed the plaintiff's action based upon his failure to establish standing to challenge the constitutionality of the legislation in question. 254 N.C. at 208, 118 S.E.2d at 410-11.

addition, municipalities exercise zoning, building code enforcement, and housing quality regulations for a number of different purposes, including, but not limited to, the avoidance of unsightly, but not necessarily unsanitary, conditions; the protection of property values; and the development of needed infrastructure. Consistent with my understanding of the reasoning underlying the regulatory authority that the Town exercises in its extraterritorial jurisdiction, the Town's Unified Development Ordinance sets out twenty-five "goals" that the Town seeks to achieve through its land use policies, the vast majority of which do not appear to have any substantial bearing on health, sanitation, and the abatement of nuisances. Boone, N.C., Unified Dev. Ordinance, art. I, § 1.04.01 (Jan. 1, 2014).[25] As a result, when the challenged legislation is considered as a whole, I am not satisfied that the General Assembly's

---

[25] More specifically, the Town's goals of "[p]rotect[ing] water quality," "[p]rotect[ing] designated water supply watersheds," and "[s]upport[ing] public health through provision of convenient exercise opportunities" appear to have a material relationship to health, sanitation, and the abatement of nuisances, while "preserv[ing] and protect[ing] areas and landmarks of historic significance," "[p]reventing degradation of natural drainage areas," "[m]inimiz[ing] public and private losses due to flood conditions," "[m]inimiz[ing] public and private losses due to slope failure caused by land disturbance of steep and very steep slopes," "[p]reserv[ing] and protect[ing] the scenic beauty and natural environment of the Town's hillside areas," "[p]reserv[ing] and protect[ing] the overall quality of life for residents and visitors," "[p]reserv[ing] and protect[ing] the character of established residential neighborhoods," "[m]aintain[ing] economically vibrant as well as attractive business and commercial areas," "[e]ncourag[ing] signage that maintains, enhances, and is compatible with the beauty and unique character of the Town," "[f]acilitat[ing] the creation of an attractive environment," "[r]etain[ing] and expand[ing] the Town's employment base," "[f]acilitat[ing] safe and efficient movement of motorists, pedestrians and cyclists," "[e]ncourag[ing] public transit," "[e]ncourag[ing] walkability and bikeability," "[m]aintain[ing] orderly and compatible land-use and development patterns," "[e]ncourag[ing] environmentally responsible development practices," "[p]romot[ing] rehabilitation and reuse of older buildings," "[m]aintain[ing] a range of housing choices and options," "[e]stablishing clear and efficient development review and approval procedures," "[p]rotect[ing] community property values," "[p]rotect[ing] and balanc[ing] private property rights," and "[b]ring[ing] about [the] eventual improvement or elimination of non-conformities" do not. *Id.*

decision to eliminate the Town's ability to exercise extraterritorial jurisdiction has a material relation to health, sanitation, and the abatement of nuisances.

Although the Town has not made any effort to define a "non-navigable stream" for purposes of Article II, Section 24(1)(e), the obverse of the term in question is well established for purposes of our State's common law regarding riparian rights, in which it is typically understood to refer to streams that are passable by watercraft. *Gwathmey v. State*, 342 N.C. 287, 300-01, 464 S.E.2d 674, 682 (1995) (stating that "all watercourses are regarded as navigable in law that are navigable in fact" (quoting *State v. Baum*, 128 N.C. 600, 604, 38 S.E. 900, 901 (1901)), and that, "if a body of water in its natural condition can be navigated by watercraft, it is navigable in fact and, therefore, navigable in law, even if it has not been used for such purpose"). For that reason, I believe that a non-navigable stream for purposes of Article II, Section 24(1)(e) is a body of water over which watercraft cannot ordinarily travel. Unlike the prohibition against the adoption of local legislation relating to health, sanitation, and the abatement of nuisances set out in Article II, Section 24(1)(a), this Court has never had the occasion to construe the prohibition against the enactment of local legislation relating to non-navigable streams contained in Article II, Section 24(1)(e). However, given the fact that both of these constitutional provisions utilize identical "[r]elating to" language, I believe that the same "materiality" test that this Court adopted in *City of Asheville*, ___ N.C. at ___, ___ S.E.2d at ___, for purposes of determining whether a particular local law relates to health, sanitation, and the abatement of

nuisances should be deemed applicable to the prohibition against the enactment of local legislation relating to non-navigable streams.

In seeking to persuade this Court that the Boone Act constitutes an impermissible local law relating to non-navigable streams, the Town points to N.C.G.S. §§ 160A-458, 160A-458.1, and 160A-459(a). Section 160A-458 provides that "[a]ny city may enact and enforce erosion and sedimentation control ordinances as authorized by Article 4 of Chapter 113A of the General Statutes, and in such enactment and enforcement shall comply with all applicable provisions of Article 4." N.C.G.S. § 160A-458. In addition, we note that N.C.G.S. § 113A-51, which serves as the "Preamble" to Article 4 of Chapter 113A, provides that "[t]he sedimentation of streams, lakes and other waters of this State constitutes a major pollution problem," that "[c]ontrol of erosion and sedimentation is deemed vital to the public interest and necessary to the public health and welfare," and that "the purpose of" Article 4 is "to provide for the creation, administration, and enforcement of a program and for the adoption of minimal mandatory standards which will permit development of this State to continue with the least detrimental effects from pollution by sedimentation." *Id.* § 113A-51 (2015). Similarly, section 160A-458.1 provides that "[a]ny city may enact and enforce floodway regulation ordinances as authorized" and in compliance with "Part 6 of Article 21 of Chapter 143 of the General Statutes," *id.* § 160A-458.1, with the purposes of floodplain regulation being to "[m]inimize the extent of floods by preventing obstructions that inhibit water flow and increase flood height and

damage," "[p]revent and minimize loss of life, injuries, property damage, and other losses in flood hazard areas," and "[p]romote the public health, safety, and welfare of citizens of North Carolina in flood hazard areas," *id*. § 143-215.51 (2015). Finally, section 160A-459 provides that "[a] city may adopt and enforce a stormwater control ordinance to protect water quality and control water quantity." *Id*. § 160A-459. Once again, while the bundle of powers that a municipality has the authority to exercise in its extraterritorial jurisdiction includes authority that is relevant to issues relating to non-navigable streams, along with other water-related subjects, I am unable to say, when the Boone Act is considered in its entirety, that the apparent purpose or practical effect of the withdrawal of the Town's authority to exercise extraterritorial jurisdiction upon non-navigable streams is a material one.

Finally, the Town has failed to make a detailed argument to the effect that the Boone Act impermissibly regulates trade. As we have previously held, "trade," for purposes of Article II, Section 24(1)(j), consists of "a business venture for profit and includes any employment or business embarked in for gain or profit." *Cheape*, 320 N.C. at 558-59, 359 S.E.2d at 798 (quoting *Smith v. County of Mecklenburg*, 280 N.C. 497, 508, 187 S.E.2d 67, 74 (1972), and citing *Pleasants*, 264 N.C. at 655-56, 142 S.E.2d at 702)). In other words, "*[p]rivate profit*" is "an inherent element of the concept of trade as used in" Article II, Section 24(1)(j). *Smith*, 280 N.C. at 510, 187 S.E.2d at 75 (citing *Gardner v. City of Reidsville*, 269 N.C. 581, 591-92, 153 S.E.2d 139, 148 (1967)). "[R]egulate" for purposes of Article II, Section 24(1)(j), means "to

govern or direct according to rule[,] . . . to bring under [ ] control of law or constituted authority." *Williams*, 357 N.C. at 189, 581 S.E.2d at 429 (quoting *State v. Gulledge*, 208 N.C. 204, 208, 179 S.E. 883, 886 (1935) (ellipsis in original), *quoted in Cheape*, 320 N.C. at 559, 359 S.E.2d at 798 (using the stated definition of "regulate" in applying Article II, Section 24(1)(j)). In instances where the aim or practical effect of the challenged legislation is the complete prohibition of a certain type of activity "without regard to whether profit or other compensation [is] involved," this Court has concluded that the legislation does not regulate trade or labor. *Smith*, 280 N.C. at 510, 187 S.E.2d at 76 (citing *State v. Chestnutt*, 241 N.C. 401, 403-04, 85 S.E.2d 297, 299 (1955)); *see Williams*, 357 N.C. at 189-90, 581 S.E.2d at 429 (concluding that the legislation in question and the related ordinance "regulate[d] labor" because "the effect of these enactments [was] to govern labor practices of 'person[s] engaged in an industry affecting commerce who has 15 or more employees' " and "regulate[d] trade" because "[m]ost of the employers affected by the [o]rdinance [were] businesses operated for gain or profit," such that "[r]egulation of these employers ha[d] the practical effect of regulating trade" (citations omitted)). Although the withdrawal of the Town's extraterritorial jurisdiction would have an impact on the business of exchanging real property for a profit, that fact does not justify a decision to invalidate the Boone Act as an impermissible attempt to regulate trade in violation of Article II, Section 24(1)(j) given that the relevant regulations affect all land use-related

activities instead of being limited to those founded upon a desire for profit. Thus, I am not persuaded by this aspect of the Town's challenge to the Boone Act as well.

As a result, for all these reasons, while I believe that the Town has standing to challenge the constitutionality of the Boone Act as violative of Article II, Section 24, and that the Town's claim is not barred by sovereign immunity considerations, I am unable, in light of the presumption of constitutionality and the breadth of the issues addressed in the Boone Act, to conclude that the challenged legislation constitutes local legislation relating to one of the prohibited subjects listed in Article II, Section 24. Although I agree with the result that the Court deems appropriate, I am unable to agree that the Boone Act implicates the General Assembly's powers over the organization, government, and boundaries of local governments and that the limitations on the enactment of local legislation set out in Article II, Section 24 have no bearing on the proper resolution of this case. As a result, I concur in the result reached by the Court without concurring in its opinion.

Justice HUDSON joins in this concurring opinion.


Justice BEASLEY dissenting.


Because I disagree with the majority's holding that the Boone Act does not violate Article II, Section 24, I would affirm the decision of the three-judge panel of the Superior Court, Wake County, that the revocation of the extraterritorial jurisdiction powers of the Town of Boone (Town) violated "the prohibition on local acts

contained in Article II, Section 24 of the North Carolina Constitution." Therefore, I respectfully dissent.

The first issue before us is to determine whether the facial challenge passes constitutional muster. The party bringing forth a facial challenge "must show that there are no circumstances under which the statute might be constitutional." *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009) (citation omitted). This Court "seldom uphold[s] facial challenges because it is the role of the legislature, rather than this Court, to balance disparate interests and find a workable compromise among them." *Id.* at 502, 681 S.E.2d at 280. This Court has consistently stated that a facial challenge is "the most difficult challenge to mount successfully." *State v. Bryant*, 359 N.C. 554, 564, 614 S.E.2d 479, 485 (2005) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987)). However, this Court's analysis does not end there. This Court must also "measure the balance struck by the legislature against the minimum standards of the constitution." *Id.* at 565, 614 S.E.2d at 486 (quoting *Henry v. Edmisten*, 315 N.C. 474, 491, 349 S.E.2d 720, 731 (1986)). "The best way for the Court to discharge this function is for it to enunciate a workable principle as to what process the law of the land minimally requires." *Henry*, 315 N.C. at 491, 340 S.E.2d at 731. Here those minimum standards require that the General Assembly not enact local laws that relate to the prohibited subjects enumerated within Article II, Section 24. The Boone Act grants the General Assembly the

authority to withdraw certain powers from the Town that relate to the constitutionally prohibited subjects listed in Article II, Section 24; therefore, the act cannot survive a facial challenge.

The General Assembly has broad powers; however, it was never the intent of the drafters of the constitution that the General Assembly be granted unbridled powers. Hence, Article II, Section 24 of the North Carolina Constitution (the Local Act Prohibition) provides instances in which the General Assembly is prohibited from enacting statutes that directly impact the welfare and services of local governments. Under the Local Act Prohibition, the North Carolina Constitution bars the General Assembly from enacting local laws, rather than general laws, affecting fourteen enumerated subjects. N.C. Const. art. II, § 24. In relevant part, the Local Act Prohibition provides that:

> (1) Prohibited subjects. – The General Assembly shall not enact any local, private, or special act or resolution:

> (a) Relating to health, sanitation, and the abatement of nuisances;

> . . . .

> (e) Relating to non-navigable streams;

> . . . .

> (j) Regulating labor, trade, mining, or manufacturing.

*Id.* art. II, § 24(1). The Local Act Prohibition further provides that "[a]ny local, private, or special act or resolution enacted in violation of the provisions of this Section shall be void." *Id.* art. II § 24(3).

This Court has acknowledged that in enacting the Local Act Prohibition "the people were motivated by the desire that the General Assembly should legislate for North Carolina in respect to the subjects specified as a single united commonwealth rather than as a conglomeration of innumerable discordant communities." *Idol v. Street*, 233 N.C. 730, 732-33, 65 S.E.2d 313, 315 (1951). Further, this Court has stated that the purpose behind adopting the Local Act Prohibition was to

> free the General Assembly from the enormous amount of petty detail which had been occupying its attention, to enable it to devote more time and attention to general legislation of statewide interest and concern, to strengthen local self-government by providing for the delegation of local matters by *general laws* to local authorities, and to require uniform and coordinated action under general laws on matters related to the welfare of the whole State.

*Williams v. Blue Cross and Blue Shield of N.C.*, 357 N.C. 170, 188, 581 S.E.2d 415, 428 (2003) (emphasis in original) (quoting *High Point Surplus Co. v. Pleasants*, 264 N.C. 650, 656, 142 S.E.2d 697, 702 (1965)). Therefore, if the General Assembly aims to address one of the subjects in the Local Act Prohibition, it must do so by enacting statewide laws of general applicability rather than local acts. *See Williams*, 357 N.C. at 188-89, 581 S.E.2d at 428 (concluding that if the General Assembly decided "to address employment discrimination by means of a state statute, Article II, Section 24

requires that it enact either a statewide law applicable to employers and their employees . . . or a general law that makes reasonable classifications based upon rational differences of circumstances").

The Local Act Prohibition provides express restrictions on the General Assembly's authority in order to safeguard against an abuse of legislative power. *See* N.C. Const. art. II, § 24 (limiting certain local, private, or special acts). As previously stated, the General Assembly is prohibited from enacting local, private, or special acts relating to one of the enumerated subjects. *Id.* art. II, § 24(1). Additionally, the Local Act Prohibition prevents the General Assembly from circumventing the prohibitions in subsection (1) by also preventing the "enact[ment] [of] any such local, private, or special act by the partial repeal of a general law." *Id.* art. II § 24(2). As a disincentive for the General Assembly to overstep its powers, the Local Act Prohibition states that "[a]ny local, private, or special act or resolution enacted in violation of the provisions of this Section *shall be void.*" *Id.* art. II § 24(3) (emphasis added).

In addition to the constitutional limitations, this Court must determine through judicial review, whether the General Assembly has abused or overstepped its legislative power or authority, thereby assessing the constitutionality of legislative acts. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 635, 781 S.E.2d 248, 250 (2016) (citing *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6-7 (1787)). Thus, this Court is required

to ensure that the General Assembly is acting within its powers and that its actions do not violate direct prohibitions of our constitution.

The Boone Act, which was enacted in 2014 by the General Assembly, withdrew the extraterritorial jurisdiction from the Town and returned regulatory control of the extraterritorial area to the County of Watauga. Act of June 26, 2014, ch. 33, sec. 1, 2013 N.C. Sess. Laws (Reg. Sess. 2014) 139, 140 (the Boone Act) ("Notwithstanding any other provision of law, the Town of Boone shall not exercise any powers of extraterritorial jurisdiction as provided in Article 19 of Chapter 160A of the General Statutes."). The issue here is whether the Boone Act violates the Local Acts Prohibition of Article II, Section 24 of the state constitution.[26] It is well settled law that courts in North Carolina

> have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional— but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.

*Glenn v. Bd. of Educ.*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936).

The majority is convinced that because Article VII, Section 1 grants plenary power to the legislature, its analysis ends as it concludes that the General Assembly

---

[26] Along with the issue of whether the Boone Act violates the Local Act Prohibition, this Court is presented with issues of sovereign immunity and standing. I agree with the analysis in the concurring opinion regarding these issues, as well as the procedural history of this case.

has the constitutional authority to enact the Boone Act. The majority concludes that

Article II, Section 24 does not apply here. According to Article VII, Section 1:

> The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.

N.C. Const. art. VII, § 1. The majority concludes that of the two clauses in paragraph

one of Article VII, Section 1, it is only under the second clause that "the General

Assembly's authority over local governments [is] expressly subject[ed] to limitations

imposed by other constitutional provisions, including the constraints on local acts in

Article II, Section 24." Assuming that the qualification contained within Article VII,

Section 1 only applies to the second clause, I disagree with the majority's conclusion

that the Boone Act falls exclusively within the first clause. As stated in the

concurring opinion, the provisions in Article VII, Section 1 relate to both municipal

boundaries (clause 1) and municipal powers (clause 2). As the concurring opinion

correctly states, "extraterritorial jurisdiction relates to regulatory power or authority

rather than the establishment of municipal boundaries" and therefore, the Boone Act

is more properly interpreted as relating to the municipal powers in the second clause.

As such, the Boone Act is subject to Article VII, Section 1's limiting language,

including the limitations imposed by Article II, Section 24. The concurring opinion

also correctly states that determining the constitutionality of the Boone Act requires

an analysis of Article II, Section 24's prohibitions; the analysis does not stop at Article VII, Section 1, as argued by the majority. Additionally, while I agree with most of the discussion set forth in the concurring opinion regarding Article II, Section 24 and the test to be applied under it, I disagree with the application of that test proffered in the concurring opinion to the facts of this case. Specifically, in regards to whether the Boone Act violates the constitutional limitations imposed by the Local Act Prohibition, I believe that this Court's decisions in *City of New Bern v. New Bern– Craven County Board of Education*, 338 N.C. 430, 450 S.E.2d 735 (1994), and *Williams*, 357 N.C. 170, 581 S.E.2d 415, guide our analysis.

To determine whether legislation violates the Local Act Prohibition we must determine whether an act is local or general. This Court follows the "reasonable classification" test to determine whether a law is general or local. *See McIntyre v. Clarkson*, 254 N.C. 510, 518-19, 119 S.E.2d 888, 894-95 (1961). An act is deemed local if it "discriminates between different localities without any real, proper, or reasonable basis or necessity–a necessity springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes, and imperatively demanding legislation for each class separately that would be useless or detrimental to the others." *McIntyre*, 254 N.C. at 518, 119 S.E.2d at 894 (citation omitted). Conversely, a law is general if "any rational basis reasonably related to the objective of the legislation can be identified which justifies the separation of units of local government into included and excluded categories." *Adams v. N.C. Dep't. of Nat. &*

*Econ. Res.*, 295 N.C. 683, 691, 249 S.E.2d 402, 407 (1978) (quoting Joseph S. Ferrell, *Local Legislation in the North Carolina General Assembly*, 45 N.C. L. Rev. 340, 391 (1967)). Here the parties are in agreement that the Boone Act is a local act. Therefore, the Boone Act discriminates against the Town without "any real, proper, or reasonable basis." *McIntyre*, 254 N.C at 518, 119 S.E.2d at 894 (citation omitted).

In *City of New Bern*, this Court analyzed the constitutionality of legislation that withdrew the City of New Bern's inspection and enforcement authority related to building, construction, fire, and safety codes for specific properties located within the city limits and reassigned those responsibilities to Craven County. *City of New Bern*, 338 N.C. at 433-44, 450 S.E.2d at 737-38. The City brought a challenge under Article II, Section 24. The legislation challenged in *City of New Bern* effectively shifted the responsibility of enforcing the building code, a power assigned to the city pursuant to N.C.G.S. § 160A-411, from the city to the county.[27] *Id*. at 437, 450 S.E.2d at 739-40. After concluding that the challenged acts were local acts, rather than general, this Court addressed whether the removal of the city's power to exercise inspection and enforcement authority pursuant to N.C.G.S. § 160A-411 related to "health, sanitation, or the abatement of nuisances." *Id*. at 439, 450 S.E.2d at 740. This Court reviewed the legislature's purpose for creating the building code and held

---

[27] Pursuant to N.C.G.S. § 160A-411, the General Assembly authorizes cities to inspect and enforce the North Carolina Building Code within their planning jurisdictions. This statute also appears within Article 19 of Chapter 160A; thus, it is among the powers that the Boone Act withdraws from the Town of Boone.

that inspections pursuant to the building code affect health and sanitation. *Id.* at 439-40, 450 S.E.2d at 740-41. This Court concluded that by "alter[ing] the selection process of those who will enforce the [c]ode," the legislation affected health and sanitation and was prohibited by the Local Act Prohibition. *Id.* at 442, 450 S.E.2d at 742.

The Court's reasoning in *City of New Bern*, that a law altering who is charged with enforcing health and sanitation laws is a law related to health and sanitation, has been consistently applied to similar local legislation brought before this Court. *See Idol,* 233 N.C. at 732-33, 65 S.E.2d at 314-15 (holding unconstitutional a local act authorizing the board of aldermen and board of commissioners to create a joint city-county board of health); *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. 140, 142-44, 16 S.E.2d 677, 678-79 (1941) (holding that local statutes that affected the process of appointment of a health officer were unconstitutional because they related to health); *Sams v. Bd. of Cty. Comm'rs*, 217 N.C. 284, 7 S.E.2d 540 (1940) (holding that legislation shifting the responsibility for enforcement of laws affecting the health of the public was barred by Article II, Section 29 (now Article II, Section 24)). Similarly, in the present case the Boone Act directly impacts the enforcement of laws, which themselves affect health and sanitation, by removing the Town's power to enforce the building code, fire code, and plumbing code, and other like regulations within the extraterritorial jurisdiction area. This Court in *City of New Bern* held that shifting

the responsibility of enforcing the building code away from the City inescapably related to health and sanitation, because the

> Code regulates plumbing in an effort to maintain sanitary conditions in the buildings and structures of this state and thus directly involves sanitation, and consequently the protection of the health of those who use the buildings. The enforcement of the fire regulations protects lives from fire, explosion and health hazards.

*City of New Bern*, 338 N.C. at 440, 450 S.E.2d at 741. This same reasoning must be applied here in that the Boone Act shifts the responsibility for enforcement of laws that affect health and sanitation—mainly, the building code, fire code, and plumbing code—from the Town to the County of Watauga. The effect on the enforcement of the building, fire, and plumbing codes in the present case is similar to that in *City of New Bern*, because the Boone Act has "alter[ed] the selection process of those who will enforce" those laws. *Id*. at 442, 450 S.E.2d at 742. As noted in the concurring opinion and our recent decision in *City of Asheville v. State*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2016), our current test focuses on whether, in light of its stated purpose and practical effect, the Boone Act has a material, but not exclusive or predominant, connection to one of the prohibited subjects. Thus, I would hold that shifting the responsibility for enforcement of the building code, fire code, and plumbing code would have a material connection to health and sanitation and thus, is a violation of the Local Act Prohibition of the North Carolina Constitution.[28]

---

[28] The concurring opinion correctly notes that the facts at issue in this case differ from the facts at issue in *City of New Bern* because *City of New Bern* involved the removal of a single power, rather than a "bundle of powers" as is the case here. However, the principles espoused in *City of New Bern*—

Moreover, this Court's decision in *Williams* lends further support for the conclusion that the Boone Act violates the Local Act Prohibition. In *Williams* the challenged legislation authorized Orange County to adopt an antidiscrimination ordinance that made it unlawful for an employer "[t]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to that individual's compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, disability, familial status, or veteran status." 357 N.C. at 175, 581 S.E.2d at 420. After concluding that the challenged legislation was a local act, this Court considered whether the legislation regulated any of the subjects listed in the Local Act Prohibition. Specifically, the Court in *Williams* sought to determine whether the legislation "regulate[d] labor or trade." *Id.* at 189, 581 S.E.2d at 429; *see* N.C. Const. art. II, § 24(1)(j).

In considering whether the challenged legislation regulated labor or trade, this Court rejected the argument that the legislation related only the acts of discrimination and did not involve labor or trade. *Williams*, 357 N.C. at 189, 581 S.E.2d at 429. Rather, this Court concluded that "while the intent of the enabling legislation and the Ordinance is to prohibit discrimination in the workplace, the *effect* of these enactments is to govern the labor practices of 'person[s] engaged in an

---

specifically the interpretation of whether the act relates to health and sanitation—are instructive.

industry affecting commerce [that] has 15 or more employees' in Orange County." *Id.* at 189, 581 S.E.2d at 429 (first alteration in original) (emphasis added). Thus, the Court focused on the practical effect of the legislation, and not its intended purpose, in determining that the legislation violated the Local Act Prohibition. As demonstrated by *Williams*, this Court's analysis is not limited to the legislative purpose or intent of an enactment. Rather, the analysis also considers the legislation's practical effect, *see id.* at 189-90, 581 S.E.2d at 429 (concluding that while the intent of the legislation was to prohibit discrimination, the legislation had the "practical effect of regulating trade"), and whether it has a material connection to the prohibited subjects of the Local Act Prohibition, as noted in the concurring opinion and our recent decision in *City of Asheville*, ___ N.C. at ___, ___ S.E.2d at ___.

Considering the practical effect of the Boone Act, I would hold that the Act violates the Local Act Prohibition. The Boone Act removes power from the Town of Boone to act within the extraterritorial jurisdiction area one mile outside of the town limits. The practical effect of removing this power is that the Town of Boone cannot enforce its ordinances within the one-mile extraterritorial jurisdiction area, including those ordinances that relate to health and sanitation, N.C. Const. art. II, § 24(1)(a), relate to non-navigable streams, *id.* art. II § 24(1)(e), and regulate labor, trade, mining, or manufacturing, *id.* art. II § 24(1)(j). According to the Town's Unified Development Ordinance (UDO), the purposes and goals of the UDO include "[p]romot[ing] the health, safety, and general welfare within the Town of Boone and

its environs," "[p]rotect[ing] water quality," "[p]rotect[ing] designated water supply watersheds," "[p]revent[ing] degradation of natural drainage areas," and "[s]triv[ing] to minimize public and private losses due to slope failure caused by land disturbance of steep and very steep slopes." Boone, N.C., Unified Dev. Ordinance, art. 1, §§ 1.03.01, 1.04.01 (Jan. 1 2014). Because these ordinances themselves relate to health, sanitation, and the abatement of nuisances, as well as other prohibited subjects, legislation that shifts the responsibility of their enforcement by removing the Town's ability to enforce those ordinances also relates to health, sanitation, and the abatement of nuisances, and thereby violates the Local Act Prohibition. *See City of New Bern,* 338 N.C. at 442, 450 S.E.2d at 742 (holding that the shifting of responsibility for enforcement of the building code affects health and sanitation, and thus, is prohibited by the Local Acts Prohibition); *Bd. of Health v. Bd. of Comm'rs*, 220 N.C. at 143, 16 S.E.2d at 679 (concluding that two local statutes that affected the process of appointment of a health officer for Nash County were unconstitutional because "[t]his Court is . . . committed to the proposition that a law affecting the selection of officers to whom is given the duty of administering the health laws is a law 'relating to health' "). Thus, by determining that the practical effect of the Boone Act relates to health, sanitation, and the abatement of nuisances, I would conclude that there is a material connection between the Boone Act and the subjects listed in the Local Act Prohibition.

As stated above, while I agree with the general discussion in the concurring opinion, I disagree with the result that the Boone Act does not violate the Local Act Prohibition. After analyzing individually each of the subjects in the Local Act Prohibition that the Town alleged the Boone Act violated, the concurring opinion concluded that the Boone Act does not materially connect to either "health, sanitation, and the abatement of nuisances," N.C. Const. art. II, § 24(1)(a),[29] "non-

---

[29] As quoted verbatim from the concurring opinion, the following statutory provisions removed from the Town implicate issues relating to health, sanitation, and the abatement of nuisances: N.C.G.S. § 160A-381 (2015) (granting zoning authority to municipalities "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community" and authorizing municipalities to regulate and restrict the height, number of stories and size of buildings and other structures; the percentage of lots that may be occupied; the size of yards, courts and other open spaces; population densities; and the location and use of buildings, structures and land); N.C.G.S. § 160A-383 (2015) (providing that "[z]oning regulations shall be designed to promote the public health, safety, and general welfare" and may address issues such as the provision of adequate light and air; the prevention of overcrowding; avoiding undue population concentration; lessening street congestion; securing safety from fire, panic, and dangers; and facilitating the provision of transportation, water, sewerage, schools, parks, and other public requirements); N.C.G.S. § 160A-383.4 (2015) (authorizing regulations seeking to reduce the amount of energy consumption through the use of measures like density bonuses and similar incentives); N.C.G.S. § 160A-412(a) (2015) (providing for the enforcement of state laws and local ordinances relating to the construction of buildings and other structures; the installation of facilities such as plumbing, electrical, and air-conditioning systems; the safe, sanitary, and healthful maintenance of buildings and other structures; and other issues specified by the city council); N.C.G.S. § 160A-424(a) (2015) (providing that "[t]he inspection department may make periodic inspections, subject to the council's discretion, for unsafe, unsanitary, or otherwise hazardous and unlawful conditions in buildings or structures within its territorial jurisdiction"); N.C.G.S. § 160A-426(b) (2015) (providing that "an inspector may declare a nonresidential building or structure within a community development target area to be unsafe if" it "appears . . . to be vacant or abandoned" or "appears . . . to be in such dilapidated conditions as to cause or contribute to blight, disease, vagrancy, fire or safety hazard, to be a danger to children, or to tend to attract persons intent on criminal activities or other activities that would constitute a public nuisance"); N.C.G.S. § 160A-432(c) (2015) (stating that "[n]othing in this section shall be construed to impair or limit the power of the city to define and declare nuisances and to cause their removal or abatement by summary proceedings, or otherwise"); N.C.G.S. § 160A-439 (2015) (authorizing the adoption of ordinances providing for the repair, closing, and demolition of nonresidential buildings or structures "that fail to meet minimum standards of maintenance, sanitation, and safety established by the governing body"); and N.C.G.S. § 160A-441 (2015) (finding "that the existence and occupation of dwellings in this State that are unfit for human habitation are inimical to the welfare and dangerous and injurious to the health, safety and morals of the people" and "that a public necessity exists for the repair, closing or demolition of such dwellings").

navigable streams," *id*. art. II § 24(1)(e),[30] or "labor, trade, mining, or manufacturing," *id*. art. II § 24(1)(j).[31] However, this Court should not analyze each of the enumerated subjects in isolation. In determining if the Boone Act violates the Local Act Prohibition, this Court should view the entire Local Act Prohibition. Thus, if this Court views all of the statutes within Article 19 of Chapter 160A that relate to "health, sanitation, and the abatement of nuisances," "non-navigable streams," and "labor, trade, mining, or manufacturing" as a whole, then the Boone Act clearly has a material connection to the prohibited subjects enumerated in the Local Act Prohibition.

Because I disagree with the majority's holding that the Boone Act does not violate Article II, Section 24, I would affirm the decision of the three-judge panel of

---

[30] As quoted verbatim from the concurring opinion that notes that the following statutory provisions removed from the Town implicate issues relating to non-navigable streams: N.C.G.S. § 160A-458 provides that "[a]ny city may enact and enforce erosion and sedimentation control ordinances as authorized by Article 4 of Chapter 113A of the General Statutes, and in such enactment and enforcement shall comply with all applicable provisions of Article 4." In addition, N.C.G.S. § 113A-51 provides that "[t]he sedimentation of streams, lakes and other waters of this State constitutes a major pollution problem," that "control of erosion and sedimentation is deemed vital to the public interest and necessary to the public health and welfare," and that "the purpose of" Article 4 is "to provide for the creation, administration, and enforcement of a program and for the adoption of minimal mandatory standards which will permit development of this State to continue with the least detrimental effects from pollution by sedimentation." N.C.G.S. § 113A-51 (2015); N.C.G.S. § 160A-458.1 provides that "[a]ny city may enact and enforce floodway regulation ordinances as authorized" and in compliance with "Part 6 of Article 21 of Chapter 143 of the General Statutes," N.C.G.S. § 160A-458.1, with the purposes of floodplain regulation being to "[m]inimize the extent of floods by preventing obstructions that inhibit water flow and increase flood height and damage," "[p]revent and minimize loss of life, injuries, property damage, and other losses in the flood hazard areas," and "[p]romote the public health, safety, and welfare of citizens of North Carolina in flood hazard areas," N.C.G.S. § 143-215.51 (2015). N.C.G.S. § 160A-459 provides that "[a] city may adopt and enforce a stormwater control ordinance to protect water quality and control water quantity." N.C.G.S. § 160A-459 (2015).

[31] The Town fails to point to any statutory provisions in support of the argument that the Boone Act relates to "labor, trade, mining, or manufacturing."

the Superior Court, Wake County that the revocation of the Town's powers of extraterritorial jurisdiction violated "the prohibition on local acts contained in Article II, Section 24 of the North Carolina Constitution."  Therefore, I respectfully dissent.